UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NANCY MAESHIRO, et al.,

        Plaintiffs,

-against-

YATSEN HOLDING LIMITED, et al.,

        Defendants.

---

22-CV-8165 (JPC) (BCM)

**MEMORANDUM AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Before the Court are the motions of (i) Kai Jun Xu, (ii) Li Zhang, and (iii) Hin Kit Eric Wong and Max Park, applying jointly, to be appointed lead plaintiff in this putative securities fraud class action pursuant to § 21D(a)(3)(B) of the Securities Exchange Act of 1924 (Exchange Act), as amended by the Private Securities Litigation Reform Act (PSLRA), *see* 15 U.S.C. § 78u-4(a)(3)(B), and to have their respective counsel approved as lead counsel. (Dkts. 24, 30, 32.) The motions are within the scope of my reference (Dkt. 45) and may be determined by a magistrate judge in accordance with 28 U.S.C. § 636(b)(1)(A). *See, e.g., Yang v. Tr. for Advised Portfolios*, 2022 WL 970772, at *1 (E.D.N.Y. Mar. 31, 2022). For the reasons that follow, the Court will grant the motion of Wong and Park, appoint Wong and Park as lead plaintiffs, and approve the selection of their counsel, Scott+Scott Attorneys at Law (Scott+Scott) as lead counsel.

**I.     BACKGROUND**

    **A.     The Complaint**

Nancy Maeshiro, represented by Scott+Scott, commenced this putative class action on September 23, 2022, against Yatsen Holding Limited (Yatsen or the Company), various Yatsen officers and directors, and the underwriters of Yatsen's November 19, 2020 initial public offering (IPO). Compl. (Dkt. 1) ¶¶ 6-29. Maeshiro sued (i) under §§ 10(b), 20A, and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t-1(a), 78t(a), and SEC Rule 10b-5, 17 C.F.R.

§ 240.10b-5, on behalf of a class of persons and entities that purchased Yatsen American Depository Shares (ADSs) between November 19, 2020 and March 10, 2022, and (ii) under §§ 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77o, on behalf of a class of persons and entities that purchased or acquired Yatsen ADSs pursuant or traceable to its Form F-1 Registration Statement and Form 424B4 Prospectus (collectively, the Offering Documents) issued in connection with the IPO. Compl. ¶¶ 2-3.

Yatsen is a Chinese company "engaged in the production and sale of cosmetics and skincare products." Compl. ¶ 14. It conducted its IPO in New York, and its ADSs trade on the New York Stock Exchange. *Id.* According to the Complaint, defendants' Offering Documents "played up" the fact that "Yatsen had become a leader in the Chinese beauty market because of the previous (and ongoing) successes of its 'fast-growing, successful' color cosmetics and skincare brands," particularly its color cosmetics brands "Perfect Diary" and "Little Ondine." Compl. ¶¶ 46-49. Following Yatsen's IPO on November 19, 2020, its public statements continued to tout the performance of its brands: on March 11, 2021, Yatsen's Chief Financial Officer described "strong performance across [Yatsen's] brand portfolio," and on May 19, 2021, Yatsen's 2021 first-quarter results reported sales exceeding guidance, citing "stellar performance of [Yatsen's] flagship Perfect Diary brand as well as robust growth from Little Ondine[.]" *Id.* ¶¶ 50-52.

Plaintiff alleges that these statements were false and/or misleading, but were not fully corrected until a series of disclosures were made in 2021 and 2022: First, on August 26, 2021, during an analyst call discussing Yatsen's second-quarter results, the Company's Chief Executive Officer (CEO) stated that the performance of its "Perfect Diary" brand was deteriorating and that Yatsen needed to "refocus and also to devote more resources to continue the growth trend[.]" Compl. ¶ 57. That day, the price of Yatsen's shares fell by 17.64%. *Id.* ¶ 58. Next, on November

17, 2021, when Yatsen announced its third-quarter results, its CEO mentioned a "significant deceleration in general consumer and color cosmetics spending in China" and a decrease in gross sales of color cosmetics due, in part, to a "realignment of Little Ondine." *Id.* ¶¶ 59-60. That day, the closing price of Yatsen's ADSs fell by 17.93% from the previous day's close. *Id.* ¶ 61. Finally, on March 10, 2022, Yatsen released its 2021 fourth-quarter and full-year results, and its CEO reported that "total net revenue from color cosmetic brands" had declined by 33.9% year-over-year in the fourth quarter, and, on a full-year basis, had declined by 2.3%. *Id.* ¶¶ 62-63. That day, the price of Yatsen's ADSs dropped by 39.5%. *Id.* ¶ 64.

**B.    The Movants**

In accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(3)(A)(i), notice of the pendency of this action was published through *Business Newswire* on September 23, 2022, advising that the deadline to file motions to be appointed lead counsel would be November 22, 2022. *See* Laughlin Decl. (Dkt. 36) Ex. A. On November 22, 2022, six such motions were filed. (Dkts. 17, 20, 22, 24, 30, 32.) Two of the movants, Scott Noren and Richard Wiemer, later withdrew their applications. (Dkts. 37, 39.) Another movant, Luca Lieto, filed a Notice of Non-Opposition, acknowledging that he "does not possess the 'largest financial interest in the relief sought by the class' as required by the PSLRA" (Dkt. 40 at 2), leaving the three motions now before the Court.

Kai Jun Xu, represented by Robbins Geller Rudman & Dowd LLP (Robbins Geller), attests that he lives in Las Vegas, Nevada, owns a commercial real estate business, and has five years of investing experience. Xu Decl. (Dkt. 28-4) ¶ 1. Trading records show that he acquired 8,738 Yatsen ADSs during the putative class period and lost approximately $104,453 under the Exchange Act and $60,883 under the Securities Act. Rosenfeld Decl. (Dkt. 28) Ex. C. His counsel, Robbins Geller, has experience in the prosecution of complex securities cases, and courts in this

district (and nationwide) have appointed the firm lead counsel in hundreds of securities class actions. Xu Mem. (Dkt. 26) at 6.

Li Zhang, represented by Pomerantz LLP (Pomerantz), attests that he lives in Wenzhou City, Zhejiang Province, People's Republic of China, where is the general manager of a fabric sales company. Zhang Decl. (Dkt. 35-5) ¶ 2. He has "prior experience retaining and working with counsel," has "passed an examination for a primary accounting certificate and securities practice qualification certificate," and has invested in "securities markets for 10 years." *Id*. Zhang received assignments of claims from two other individuals who also purchased Yatsen ADSs, Chongquan Zhang and Rong Zhang. Lieberman Decl. (Dkt. 35) Ex. A (the Zhang Assignments). Trading records from the Zhangs' three accounts show that they purchased 61,400 Yatsen ADSs and incurred total losses of approximately $367,973 under the Exchange Act and $330,207 under the Securities Act. *Id*. Exs. B, D. The records do not identify which of the three accounts belongs to proposed lead plaintiff Zhang and which belong to the assignors. Zhang's U.S. law firm, Pomerantz, has extensive experience representing shareholders in securities litigation, including serving as lead counsel on behalf of classes of investors. *Id.* Ex. F, at 1-6.

Hin Kit Eric Wong and Max Park, represented by Scott+Scott, attest that they are friends with a preexisting relationship who seek joint appointment "in order to gain the advantages of joint decision-making, collective resources, and to provide the Class stable representation." Wong/Park Decl. (Dkt. 36-4) ¶¶ 3-4, 6. In their joint declaration, Wong states that he is a student at the University of California, Riverside with approximately two years of investing experience, and that he is the "son of Ching Wa Wong, the owner of the account through which . . . I purchased Yatsen

ADS during the Class Period. *Id.* ¶ 4.[1] Park states that he is a student at New York University, as well as "an executive at a wholesale importer of women's athletic apparel" and a "sophisticated investor with approximately three years of investing experience." *Id.* ¶ 3. Wong and Park supply trading records showing that Wong purchased approximately 50,861 Yatsen ADSs and lost approximately $624,171, while Park purchased 5,792 Yatsen ADSs and lost approximately $73,554, for total losses of approximately $697,725. Laughlin Decl. (Dkt. 36) Ex. D.[2] Their law firm, Scott+Scott has experience prosecuting complex securities law actions, including in this district. *Id*. Ex. E, at ECF pp. 10-11.

## II.     LEGAL STANDARD

The PSLRA requires that the district court "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). There is a rebuttable presumption that the most adequate plaintiff is the party that "(1) either filed the complaint or made a timely motion to be appointed lead; (2) 'has the largest financial interest in the relief sought by the class'; and (3) 'otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.'" *Tan v. Goldman Sachs Grp. Inc.*, 2022 WL 1094766, at *1 (S.D.N.Y. Apr. 12, 2022) (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)). Rebutting this presumption requires "proof . . . that the presumptively most adequate plaintiff" (1) "will not fairly and adequately protect the interests

---

[1] Wong attaches an assignment agreement in which his mother, Ching Wa Wong, "assigns, transfers and sets over to Assignee all rights, title, and interests of the Assignor in any and all claims, demands, and causes of action of any kind whatsoever which the Assignor has or may have arising from violations under the federal securities laws of the United States of America in connection with the purchase of the publicly traded securities of Yatsen Holding Limited." Wong/Park Decl. at ECF p. 6 (the Wong Assignment).

[2] Wong and Park calculated their losses under the Exchange Act only.

of the class"; or (2) "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

### A. Largest Financial Interest

Although the PSLA does not prescribe a method for calculating a movant's "financial interest in the relief sought by the class," courts in this district typically consider: "(1) the number of shares purchased, (2) the number of net shares purchased, (3) the total net funds expended during the class period, and (4) the plaintiff's approximate losses." *Kniffin v. Micron Tech., Inc.*, 379 F. Supp. 3d 259, 263 (S.D.N.Y. 2019) (quoting *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 530 (S.D.N.Y. 2015)); *see also In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2016 WL 5867497, at *3 (S.D.N.Y. Oct. 4, 2016).[3] The "final factor," approximate losses, "is by far the most important." *City of Sunrise Firefighter's Pension Fund v. Citigroup Inc.*, 2021 WL 396343, at *3 (S.D.N.Y. Feb. 4, 2021) (Nathan, J.); *see also Cortina v. Anavex Life Sciences Corp.*, 2016 WL 1337305, at *1 (S.D.N.Y. Apr. 5, 2016) ("Courts tend to treat the factors in ascending order of importance, with the number of shares purchased as the least important and the size of the loss the most important[.]").

In assessing approximate financial losses, courts in this district typically rely on a "last-in first-out" (LIFO) calculation. *See In re Paysafe, Ltd.*, 2022 WL 1471122, at *5 n.6 (S.D.N.Y. May 10, 2022) ("LIFO is the preferred and most-widely-accepted methodology for calculating movants' losses."); *Kniffin*, 379 F. Supp. 3d at 264 (LIFO is "the 'overwhelming trend in this district and nationwide'") (quoting *Bo Young Cha v. Kinross Gold Corp.*, 2012 WL 2025850, at *3 (S.D.N.Y.

---

[3] These factors are often referred to as the *Lax/Olsten* factors, because they are derived from *Lax v. First Merchants Acceptance Corp.*, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997), and *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y.1998). *See Khunt*, 102 F. Supp. 3d at 530; *Beckman v. Enerl, Inc.,* 2012 WL 512651, at *2 (S.D.N.Y. Feb. 15, 2012).

May 31, 2012)). Under this formula, "the last purchases made during the class period" are matched up with "the first sales made during the class period," which tends to offset any gains attained from artificially inflated stock prices during the class period. *Kniffin*, 379 F. Supp. 3d at 264; *accord City of Monroe Emps. Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, 269 F.R.D. 291, 295 (S.D.N.Y. 2010). Here, each movant has calculated his losses using a LIFO methodology.

Additionally, in Exchange Act cases, "the recent trend in this district is for movants to adjust their LIFO calculations to remove any losses arising from securities that were bought and sold before a defendant's corrective disclosure." *Kniffin*, 379 F. Supp. 3d at 264. This adjustment is appropriate because, under the logic of *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) (reaffirming that a plaintiff suing under § 10(b) of the Exchange Act and Rule 10b-5 must plead both economic loss and loss causation), any losses incurred before the alleged misconduct was disclosed to the public "cannot be proximately linked to the misconduct at issue" and hence are not recoverable. *Khunt*, 102 F. Supp. 3d at 531. And "[i]f a lead plaintiff movant cannot recover a given loss in the action he seeks to lead, the loss cannot logically contribute to his financial stake in that action." *Id.*; *see also City of Sunrise*, 2021 WL 396343, at *3 ("Because the lead plaintiff should be the class member who stands to recover the most from that litigation, courts should 'consider only those losses that will actually be recoverable in the class action.'") (quoting *Topping v. Deloitte Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 617 (S.D.N.Y. 2015)).

However, "[l]oss causation is not an element of a claim under Section 11 of the Securities Act." *Marquez v. Bright Health Grp., Inc.*, 2022 WL 1314812, at *6 (E.D.N.Y. Apr. 26, 2022).[4]

---

[4] *See New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013) ("[U]nlike securities fraud claims pursuant to section 10(b) of the Securities Exchange Act of 1934, plaintiffs bringing claims under sections 11 and 12(a)(2) [of the Securities Act] need not allege scienter, reliance, or loss causation.") (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010)) (second alteration supplied).

In § 11 cases, a plaintiff's "recoverable damages" are determined by calculating "the difference between the purchase price and, depending on the circumstances of the case, either (1) the share price on the date suit was brought, or (2) the price at which the shares were sold prior to litigation, or (3) the price at which the shares were sold during litigation." *Id.* (citing 15 U.S.C. § 77k(e)). Hence, when assessing approximate losses for § 11 purposes, class members seeking to serve as lead plaintiff need not perform a *Dura* adjustment. *Id.*

### B.     Rule 23

Rule 23(a) permits a party to sue on behalf of a class if, among other things, "the claims or defenses of the representative parties are typical of the claims or defenses of the class," and "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3)-(4). However, "in deciding a motion to serve as lead plaintiff, '[t]he moving plaintiff must make only a preliminary showing that the adequacy and typicality requirements under Rule 23 have been met.'" *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co.*, 229 F.R.D. 395, 412 (S.D.N.Y. 2004) (quoting *Weinberg v. Atlas Air Holdings, Inc.*, 216 F.R.D. 248, 252 (S.D.N.Y. 2003)); *accord Peifa Xu v. Grisdum Holding Inc.*, 2018 WL 4462363, at *4 (S.D.N.Y. Sept. 17, 2018). A "wide ranging analysis under Rule 23" need not be undertaken at this early stage of the litigation and "should be left for consideration of a motion for class certification." *Weinberg*, 216 F.R.D. at 252.

## III.    DISCUSSION

### A.     Timeliness

The PSLRA allows any putative class member (or group of members) to move for appointment as lead plaintiff within 60 days of publication of notice than the first action has been filed. *See* 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). All three motions now before the Court were timely filed on November 22, 2022.

8

**B.   Financial Interest**

As demonstrated by the declarations filed by and on behalf of each movant, Wong and Park sustained the largest LIFO losses of the three movants, followed by Zhang and then Xu:

| Movant | Shares Purchased | Retained Shares | Exchange Act Loss (LIFO) | Securities Act Loss (LIFO) |
|---|---|---|---|---|
| Xu | 8,738 | 8,738 | $104,453 | $60,883 |
| Zhang | 61,400 | 56,283 | $367,973 | $330,207 |
| Wong/Park | 56,653 | 34,809 | $697,725 | $153,412 |

*See* Rosenfeld Decl. Ex. C; Lieberman Decl. Ex. D; Laughlin Decl. Ex. B.[5]

Zhang does not dispute that Wong and Park have higher overall LIFO losses, but argues that he nonetheless possesses the largest financial interest "under an appropriately holistic analysis that takes into account all four *Lax* factors," because he purchased the most total shares (61,400) and retained the most shares at the end of the class period (56,283). *See* Zhang Opp. Mem. (Dkt. 41) at 3. As noted above, however, the fourth factor "is by far the most important." *City of Sunrise*, 2021 WL 396343, at *3; *see also McKenna v. Dick's Sporting Goods, Inc.*, 2018 WL 1083971, at *4 (S.D.N.Y. Feb. 27, 2018) ("Financial loss is the factor typically given the most weight[.]"); *Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 270 (S.D.N.Y. 2015) ("Most courts agree that the largest loss is the critical ingredient in determining the largest financial interest and outweighs net shares purchased and net expenditures.").

---

[5] The figures reproduced here are those calculated by each movant, except that Wong and Park did not separately calculate their Securities Act losses (despite arguing that they "have both Securities Act and Exchange Act claims," *see* Wong/Park Reply Mem. (Dkt. 49) at 10). According to Zhang, Wong and Park's total Securities Act losses are $153,412. *See* Zhang Opp. Mem. at 3. Wong and Park do not dispute this figure, which the Court accordingly adopts.

Moreover, when courts rely on *Lax/Olsten* factors other than the largest financial loss, it is typically because the LIFO losses among competing movants are "roughly equivalent." *See Cortina*, 2016 WL 1337305, at *2 (finding that Truong, who was "heavily favor[ed]" in terms of net shares purchased and net funds expended, had the greatest financial interest where his competitor, Din, "suffered a financial loss that is at most $1,132.04 greater than Truong's loss – or roughly 3.5% of each movant's total loss"); *Westchester Putnam Ctys. Heavy & Highway Laborers Loc. 60 Benefit Funds v. Brixmor Prop. Grp. Inc.*, 2016 WL 11648466, at *1-*2 (S.D.N.Y. Nov. 29, 2016) (finding that the "Institutional Investors" had the greatest financial interest where they were "overwhelmingly favor[ed]" by the first three factors, although the competing movant, the "Chester Group," "incurred larger losses" by 16%). In this case, the competing movants' LIFO losses are not roughly equivalent. For Exchange Act purposes, the total LIFO loss sustained by Wong and Park is nearly double the loss sustained by Zhang, and approximately six and a half times the loss sustained by Xu.[6]

Zhang further argues, correctly, that for Exchange Act purposes, the Court should at least consider the movants' "recoverable losses" under a *Dura* analysis. Zhang Opp. Mem. at 2. Park

---

[6] Zhang argues that he "splits the largest loss factor with Wong and Park" because while they have the largest LIFO loss under the Exchange Act, he has "the largest loss for Securities Act claims," which he calculates on a LIFO basis to be $330,207, "or over twice as large as Wong and Park's collective $153,412 LIFO-based Securities Act loss." Zhang Opp. Mem. at 14. However, Zhang offers no explanation, or legal support, for his contention that the movants' Securities Act losses (which are smaller, for each movant, than the same movant's Exchange Act losses) should be given equal weight. The Court notes as well that Zhang makes this argument for the first time in his opposition papers. In his opening brief, he does not even calculate his Securities Act losses. "[C]ourts are especially skeptical of a movant who initially presents one position in their opening brief and switch to another in their opposition after a new movant comes in alleging a greater loss," and tend to view "new methodologies, loss calculations, or substantive allegations [made] only in opposition" as "the type of opportunism that is generally unfavored in appointing lead plaintiffs." *City of Sunrise*, 2021 WL 396343, at *4 (collecting cases). The Court therefore rejects Zhang's argument that his somewhat larger Securities Act losses offset Wong and Park's substantially larger Exchange Act losses.

10

sold all of his Yatsen ADSs by June 2, 2021, nearly three months before any of the three corrective disclosures alleged in this action. *See id*. at 6; *see also* Wong/Park Reply Mem. at 4. Park's losses are therefore not recoverable under the Exchange Act. *City of Sunrise*, 2021 WL 396343, at *3; *Khunt*, 102 F. Supp. 3d at 531. However, under a properly-constructed *Dura* analysis, Wong's losses are still significantly higher than Zhang's:

| Movant | Exchange Act Loss (*Dura*-adjusted) |
|---|---|
| Xu | $104,453 |
| Zhang | $360,069 |
| Wong/Park | $570,335 |

*See* Rosenfeld Decl. Ex. C; Wong/Park Reply Mem. at 4-5; Laughlin Reply Decl. (Dkt. 50) Exs. A, B.[7] Consequently, regardless of whether the parties' LIFO losses are adjusted in accordance

---

[7] Xu's *Dura*-adjusted losses are the same as his unadjusted losses, as he had no "in and out" transactions. *See* Rosenfeld Decl. Ex. C. The *Dura*-adjusted figures reproduced here for Zhang and for Wong and Park were calculated by Wong and Park, who explain that they excluded "all in and out transactions resulting in a loss" while including "any gains." Laughlin Reply Decl. Ex. A, at ECF p. 6. Zhang calculates his *Dura*-adjusted losses (and those of Wong and Park) very differently, concluding that "only **$72,976** of Wong's losses are in fact traceable to the fraud alleged in the Action," Zhang Opp. Mem. at 12, compared to $79,639 for Zhang. *Id*. at 3. However, Zhang utilizes a methodology in which "the Court multiplies the number of shares retained by the movant at the time of each disclosure by the difference between (i) the last closing price prior to the disclosure and (ii) the first closing price following the corrective disclosure[.]" *Id*. at 11-12. Significantly, Zhang cites no authority for this approach, which has been considered and rejected by judges in this district because it "renders purchase price irrelevant," which is "inconsistent with the statutory scheme and with *Dura* itself." *Sallustro*, 93 F. Supp. 3d at 276; *see also San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*, 2023 WL 3750115, at *6 (S.D.N.Y. June 1, 2023) ("[T]reating the recoverable loss per share as equal to the price drop that occurred on the date of each disclosure pretends that every class member purchased shares only on the day before the first disclosure."); *Simco v. Aegean Marine Petroleum Network, Inc.*, 2018 WL 11226076, at *3 (S.D.N.Y. Oct. 30, 2018) (rejecting movant's "seemingly novel methodology" and instead relying on unadjusted LIFO losses to determine the movant with the largest financial interest in the relief sought). Consequently, the Court accepts the *Dura*-adjusted calculations provided by Wong and Park.

with *Dura*, I conclude that Wong and Park sustained a greater financial loss than Zhang, making Wong and Park the presumptively most adequate lead plaintiffs.

    C.    **Rule 23**

        1.    **Typicality**

Seeking to rebut the presumption, Zhang challenges Wong and Park on typicality grounds, arguing that Park's pre-disclosure sales subject him to the "unique defense that he lacks standing to pursue [the Exchange Act] claims in this action." Zhang Opp. Mem. at 19. Zhang further contends that "Wong and Park stand or fall as a group," because – according to Zhang – courts in this district "routinely find that lead plaintiff movants in PSLRA cases that move together as a group should also be disqualified together as a group should one member of the group prove inadequate or atypical under Rule 23." *Id.* at 22.

Zhang is mistaken. In the class certification context, typicality is satisfied if "each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Husson v. Garrett Mot., Inc.*, 2021 WL 211541, at *3 (S.D.N.Y. Jan. 21, 2021) (quoting *In re Fuwei Films Securities Litig.*, 247 F.R.D. 432, 436 (S.D.N.Y. 2008)). But "[n]othing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004). "Rather, because the PSLRA mandates that courts must choose a party who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim." *Id.*; *accord Shapiro v. TG Therapeutics, Inc.*, 2022 WL 1655585, at *4 (S.D.N.Y. Oct. 31, 2022) (appointing lead plaintiff even though it purchased shares after the alleged initial corrective disclosure); *see also Hom v. Vale, S.A.*, 2016 WL 880201, at *7 (S.D.N.Y. Mar. 7, 2016) (declining to appoint co-lead plaintiff, even though lead plaintiff may have been unable to establish loss causation – and

thus recoverable losses – with respect to certain corrective disclosures, because "nothing in the PSLRA requires that the lead plaintiffs have standing to assert all of the claims that may be made").

Not surprisingly, therefore, in most of the cases that Zhang cites to support his "stand and fall as a group" theory, the group was disqualified not because one member lacked standing with respect to one claim in the litigation, but because the group could not show that its members could "function cohesively and effectively manage the litigation apart from their lawyers." *Nakamura v. BRF S.A.*, 2018 WL 3217412, at *3 (S.D.N.Y. July 2, 2018); *see also Chauhan v. Intercept Pharm.*, 2021 WL 235890, at *5 (S.D.N.Y. Jan. 25, 2021) (declining to appoint a proposed group whose members failed to show "that they were not 'cobbled together' by counsel simply to win the position of lead plaintiff and lead counsel"); *Jakobsen v. Aphria, Inc.*, 2019 WL 1522598, at *2-*3 (S.D.N.Y. Mar. 27, 2019) (declining to appoint a group of "unrelated investors without a pre-litigation relationship" who failed to otherwise demonstrate their fitness to serve together as lead plaintiff); *In re Petrobras Securities Litig.*, 104 F. Supp. 3d 618, 622-23 (S.D.N.Y. 2015) (refusing to appoint a group comprised of three companies whose "only common thread" was "their longtime connection to a law firm . . . which admittedly served as the catalyst for the group's formation," and who not only purchased the subject stock following corrective disclosures but made public statements, at that time, to the effect that the company was undervalued).

In the remaining case that Zhang cites, *Porzio v. Overseas Shipholding Grp.*, the court did, in fact, refuse to appoint a lead plaintiff group because some members sold their stock "before the corrective disclosure," creating "a strong likelihood that their entire claimed losses will be unrecoverable." 2013 WL 407678, at *2-*3 (S.D.N.Y. Feb. 1, 2013). However, the circumstances of that case are reversed from those before this Court. In *Porzio*, it was the plaintiffs with the overwhelming majority of the group's LIFO losses who sold stock before the corrective disclosure,

13

and thus lacked standing. *See id.* In this case, the plaintiff who is alleged to lack standing under the Exchange Act has just $73,554 of the group's approximately $697,725 total relevant LIFO losses, leaving $624,171 in losses remaining. *See* Laughlin Decl. Ex. B, at ECF pp. 2-8. Further, the Complaint in this action includes claims under the Securities Act for the alleged misrepresentations made in Yatsen's registration statement. *See* Compl. ¶ 3. As to these claims, it is irrelevant whether Park sold his shares before Yatsen made corrective disclosures. *See Marquez*, 2022 WL 1314812, at *7.

Neither Zhang nor Xu asserts that Wong lacks standing to pursue the Exchange Act claims set out in the Complaint, and neither of them disputes that both Wong and Park have standing to pursue the Securities Act claims. Under the circumstances presented here, I conclude that Park's sale of his Yatsen ADSs prior to the corrective disclosures does not disqualify Wong and Park, as a group, from serving as lead plaintiff in this action.

### 2. Adequacy

"In order to satisfy the adequacy requirement, the lead plaintiff must be able to 'fairly and adequately protect the interests of the class.'" *In re Fuwei Films*, 247 F.R.D. at 436. This in turn requires a showing that "(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the proposed lead plaintiff and the members of the class; and (3) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy." *Foley v. Transocean Ltd.*, 272 F.R.D. 126, 131 (S.D.N.Y. 2011); *accord Carpenter v. Oscar Health, Inc.*, 631 F. Supp. 3d 157, 162 (S.D.N.Y. 2022).

Additionally, although the PSLRA expressly permits a "person or group of persons" to be appointed lead plaintiff, 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I), in some cases "courts have identified adequacy-related considerations arising from the concern that the group will not function

cohesively and will be unable to effectively coordinate and supervise counsel." *Lian v. Tuya Inc.*, 2022 WL 17850134, at *3 (S.D.N.Y. Dec. 22, 2022). In this district, courts consider the following four factors "when evaluating whether a group's members will function cohesively and separately from their lawyers":

> (1) the existence of a pre-litigation relationship between group members; (2) involvement of the group members in the litigation thus far; (3) plans for cooperation; (4) the sophistication of its members; and (5) whether the members chose counsel, and not vice versa.

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 392 (S.D.N.Y. 2008).

No concerns have been raised about Scott+Scott's capability to conduct this litigation.[8] Nor do any of the competing movants identify any grounds for conflict between Wong and Park and other class members. With respect to the *Varghese* factors, the Court notes that Wong and Park attest that they are friends and decided to move for appointment as lead plaintiff jointly, "given [their] preexisting relationship"; that they are sophisticated investors (despite their youth) who have already held multiple calls with proposed lead counsel (as well as with unexplained "additional counsel The Schall Law Firm") to discuss the case; and that they are committed to supervising proposed lead counsel for the benefit of all class members. Wong/Park Decl. ¶¶ 6, 8-9. I therefore conclude that Wong and Park have the ability to function cohesively and independently of their counsel.

Xu disputes that Wong has a sufficient interest in the outcome of the case, arguing that the assignment upon which he relies (from his mother) is "fatally defective," because the assignor

---

[8] Other courts in this circuit have appointed Scott+Scott as lead counsel in securities fraud class actions, finding the firm qualified, experienced, and generally able to conduct the litigation. *See, e.g.*, *Pompano Beach Police and Firefighters' Ret. Sys. v. Olo Inc.*, 2022 WL 17832556, at *2 (S.D.N.Y. Dec. 21, 2022); *Silverberg v. DryShips, Inc.*, 2018 WL 10669653, at *8 (E.D.N.Y. Aug. 21, 2018); *Int'l Union of Operating Eng'rs Loc. No. 478 Pension Fund v. FXCM Inc.*, 2015 WL 7018024, at *6 (S.D.N.Y. Nov. 12, 2015). This Court concurs.

"specifically retained the right to revoke the purported assignment at any time," and thus that Wong is also subject to "a unique standing defense." Xu Opp. Mem. (Dkt. 42) at 3. Xu relies on what he calls the "Revocation Clause" in the Wong Assignment, which states: "This Assignment (which is coupled with an interest) may not be revoked without the written consent of Assignor." Wong Assignment ¶ 4.

Xu is correct that if the assignor retains a right to terminate the assignee's authority to pursue claims, the assignment fails to confer standing for purposes of the PLSRA. *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir. 1997) (assignee lacked standing to pursue assignor's claims because the assignment granted "the power to commence and prosecute to final consummation or compromise any suits, actions or proceedings" but reserved to the assignor "the right to terminate its participation if it later concludes that, based on the results of discovery or the general course of litigation, it is in its best interests to do so"). However, Xu has failed to establish that the assignment from Ching Wa Wong to Hin Kit Eric Wong is revocable at will.[9]

---

[9] The Wong Assignment, like the Zhang Assignments (to which Xu does not object), transfers to the Assignee "all rights, title, and interest of the Assignor in any and all claims, demands, and causes of action of any kind whatsoever which the Assignor has or may have arising from violations under the federal securities laws of the United States in connection with the purchase of the publicly traded securities of Yatsen Holding Limited," appoints the Assignee as "the Assignor's true and lawful attorney-in-fact for the purpose of exercising all powers relating to such causes of action," requires the assignee to remit any proceeds to the assignor, and makes the assignment binding on "the parties, their successors and assigns." Wong Assignment ¶¶ 1-3, 5. But where the Zhang Assignments state that they may not be revoked without the written consent of the assignee (Li Zhang), the Wong Assignment states that it may not be revoked without the written consent of "the Assignor." *Id.* ¶ 4. The language upon which Xu relies is likely a scrivener's error. If the intent were to *permit* the assignor to revoke the assignment at will, the document would so state, rather than *require* the assignor (somewhat nonsensically) to obtain her own "written consent" to do so. In any event, under the laws of California (where Wong resides, *see* Wong/Park Decl. ¶ 4), a clause requiring one party to a contract to obtain her own consent to terminate that contract would not override the California Civil Code, which provides that, unless the parties expressly stipulate

Finally, Zhang attacks the adequacy of Wong and Park to serve as lead plaintiffs on the basis of "glaring inconsistencies between the trades attested to in their loss chart . . . and Wong's sworn shareholder Certification." Zhang Opp. Mem. at 17. As Zhang points out, Wong's loss calculation includes four sales that Wong made on March 18, 2021, but those sales "are inexplicably missing from Wong's [PSLRA] Certification." *Id.* at 18. Wong and Park concede that those four transactions "were inadvertently omitted from [Wong's] Schedule A," Wong and Park Reply Mem. at 8, and submit a corrected Schedule A to Wong's PSLRA Certification with their reply papers. Laughlin Reply Decl. Ex. C.

Courts have disqualified movants on adequacy grounds due to "significant errors and inconsistencies" in their motion papers. *See, e.g.*, *Rodriguez*, 2021 WL 5282006, at *5, *9-*10 (finding that a movant's "PSLRA certification overstate[d] and cloud[ed] his losses by omitting (1) profits from options transactions, (2) millions of dollars' worth of DraftKings common stock trades, and (3) short selling activity" and "inadvertently treat[ed] certain sales as purchases," and that the movant's "unique trading patterns and slapdash submissions to the Court . . . militate[d] strongly against finding him the best suited putative class representative"). The omission here (which was readily apparent to Zhang because the same sales were included in Wong's loss calculation) does not rise to that level. Courts "routinely reject criticisms based on errors in certifications, particularly where there is no evidence of bad faith or intent to deceive the court or the parties." *In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *8 (S.D.N.Y. Jan. 24, 2012); *see also Siegel v. Boston Beer Co., Inc.*, 2021 WL 5909133, *8 (S.D.N.Y. Dec. 14, 2021) (appointing lead plaintiff, notwithstanding error in misdating four transactions, because movant's "loss

---

otherwise, a valid contract may be rescinded "if all the parties thereto consent." Cal. Civ. Code § 1689(a).

calculation was unaffected by these apparent typographical errors"); *In re IPO Sec. Litig.*, 227 F.R.D. 65, 98 (S.D.N.Y. 2004) (appointing lead plaintiffs at the class certification stage, over similar objections, where "none of the inconsistencies or omissions complained of by defendants, such as failing to disclose certain specific transactions, affect the merits of the class representatives' manipulation claims"), *vacated on other grounds*, 471 F.3d 24 (2d Cir. 2006)). Here, the inadvertent omission of four trades from Wong's Certification "do[es] not impact any aspect of this litigation or prejudice Defendants." *In re SLM Corp.*, 2012 WL 209095, at *8. Consequently, the presumption in Wong and Park's favor has not been rebutted.

IV.   **APPROVAL OF LEAD COUNSEL**

The PSLRA provides that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). While "the lead plaintiff's right to select and retain counsel is not absolute," *City of Ann Arbor Emps' Ret. Sys. v. Citigroup Mortg. Loan Tr. Inc.*, 2009 WL 10709107, at *5 (E.D.N.Y. Mar. 9, 2009) (citations omitted), "[t]here is a strong presumption in favor of approving a properly-selected lead plaintiff's decision as to counsel." *Topping*, 95 F. Supp. 3d at 623; *see also Rauch v. Vale S.A.*, 378 F. Supp. 3d 198, 211 (E.D.N.Y. 2019) ("The Court generally defers to the plaintiff's choice of counsel, and will only reject the plaintiff's choice . . . if necessary to protect the interests of the class.") (quoting *Brday v. Frontier Commc'ns Corp.*, 2018 WL 525485, at *11 (D. Conn. Jan. 18, 2018)). Here, the Court is unaware of any information that would make it necessary to reject plaintiffs' choice in order to protect the interests of the putative class. Consequently, Scott+Scott will be approved as lead counsel.

## V. CONCLUSION

For the reasons set forth above, Wong and Park's motion for appointment as Lead Plaintiffs and for approval of selection of Lead Counsel (Dkt. 32) is GRANTED. The competing motions of Xu (Dkt. 24) and Zhang (Dkt. 30) are DENIED.

Lead Counsel shall have the following duties and responsibilities on behalf of the Lead Plaintiffs and the putative class:

(a) briefing and argument of motions;

(b) coordination and supervision of discovery proceedings, including depositions;

(c) coordination and supervision of pretrial preparation and the conduct of trial;

(d) coordination and supervision of settlement negotiations;

(e) coordination and supervision of any other matters concerning the prosecution, resolution, or settlement of this action.

Additionally, Lead Counsel shall have the responsibility of receiving and disseminating court orders and notices to all plaintiffs and serving as the contact point with defendants' counsel, who may effect service of papers on all plaintiffs by serving them upon Lead Counsel.

The Clerk of Court is respectfully directed to terminate the motions at Dkts. 24, 20, and 32, as well as the motions of Lieto (Dkt. 17), Wiemer (Dkt. 20), Noren (Dkt. 22).

Dated: New York, New York
July 21, 2023

SO ORDERED.

_____
**BARBARA MOSES**
**United States Magistrate Judge**

19