# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE YATSEN HOLDING LIMITED SECURITIES LITIGATION, | Case No. 22 Civ. 8165 (JPC) (BCM) |
| | **JURY TRIAL DEMANDED** |

**AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Court-appointed Lead Plaintiffs Hin Kit Eric Wong and Max Park ("Lead Plaintiffs") make the following allegations, individually and on behalf of all others similarly situated, by and through Lead Plaintiffs' counsel, upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief are based upon, *inter alia*, counsel's investigation, which included, among other things, review and analysis of: (i) regulatory filings made by Yatsen Holding Limited ("Yatsen" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by the Company and transcripts of conference calls with securities analysts; and (iii) analyst reports and media reports, as well as other publicly available information about the Company. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**SUMMARY OF THE ACTION**

1. This securities class action is brought on behalf of purchasers of Yatsen American Depositary Shares ("ADS") during the period November 19, 2020, through March 10, 2022, inclusive (the "Class" and the "Class Period") seeking to pursue remedies under §§11 and 15 of the Securities Act of 1933 (the "Securities Act") and §§10(b) and 20(a) of the Securities Exchange

1

Act of 1934 (the "Exchange Act") as well as SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2.      Yatsen is a China-based holding company engaged in the production and sale of color cosmetics and skincare products.  On November 19, 2020, Yatsen sold 59 million ADS to investors at $10.50 per share in an initial public offering (the "Offering" or the "IPO") that raised $616.9 million.  The IPO was conducted pursuant to a Form F-1 Registration Statement and incorporated Prospectus filed with the SEC on November 19, 2020, and declared effective on November 18, 2020 (the "Offering Documents").  Yatsen's ADS trade on the New York Stock Exchange ("NYSE").

3.      Founded in 2016, at the time of the IPO, Yatsen's portfolio of color cosmetics and skincare brands included two home-grown brands – *Perfect Diary* and *Abby's Choice* – and two acquired brands – *Little Ondine* and *Galénic* – purchased in 2019 and 2020, respectively. However, at the time of the IPO, *Perfect Diary* and *Little Ondine* were Yatsen's two largest and most significant brands contributing over 95% of the Company's revenues in 2020.

4.      The Offering Documents described Yatsen's *Perfect Diary* and *Little Ondine* brands as "fast-growing" and touted Yatsen's ability to rapidly launch and scale multiple brands to address the preferences of a variety of demographics and price points within China's enormous beauty market.  In this regard, the Offering Documents highlighted that in 2019, just three years after its launch, *Perfect Diary* had become "the top color cosmetics brand in China in terms of online retail sales value,"[1] was recognized as the "[s]econd [m]ost [f]avorite Chinese Domestic Brand among the Post-2000 Generation by Tmall across all consumer categories," and was "No. 1 in the eye shadow, mascara and lip gloss subcategories in terms of GMV [Gross Merchandise Value] on

---

[1]      Prospectus at 1.

2

Tmall,"[2] the largest business-to-consumer ("B2C") e-commerce platform in China. The Offering Documents similarly highlighted *Little Ondine's* rapid growth stating that it had "achieved within eight months of [its 2019 relaunch following Yatsen's acquisition of the brand] the same level of monthly net revenue as *Perfect Diary* did in its first year" having "benefited from the capabilities that [the Company] built with *Perfect Diary* to scale even faster."[3]

5.      However, the foregoing statements in the Offering Documents regarding Yatsen's rapid and ongoing growth and the Company's ability to quickly launch and scale brands, and others detailed herein, were untrue and misleading. By the time of the Offering, sales of Yatsen's flagship, *Perfect Diary* brand, had hit a wall and were generally trending down. At the same time, monthly sales revenues of *Little Ondine*, which the Prospectus touted as a second growth engine that was purportedly on a quicker growth trajectory since its launch than *Perfect Diary* had enjoyed, had declined sharply from August 2020 to October 2020. This constituted a significant reversal in the positive trends highlighted in the Offering Documents causing the reported financial information in the Offering Documents to "not . . . be . . . indicative of future operating results" in violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303").

6.      In addition, as detailed herein, Defendants' post-IPO statements continued to falsely tout the performance and prospects of the *Perfect Diary* and *Little Ondine* brands as "strong," "stellar," and "robust" although the negative pre-IPO trends continued and accelerated after the Offering.

7.      A series of disclosures between August 26, 2021, and March 10, 2022, revealed the true facts causing Yatsen's stock price to crater. By the commencement of this action, Yatsen's

---

[2]      Prospectus at 2.

[3]      *Id*. at 107.

ADS traded as low as $0.39 per ADS, a decline of over 96% from the $10.50 offering price. All told, investors have lost hundreds of millions of dollars.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under §§11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o), and §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), as well as SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the Securities Act (15 U.S.C. §77v) and §27 of the Exchange Act (15 U.S.C. §78aa).

10. Venue is properly laid in this District pursuant to 28 U.S.C. §1391(b)-(c), §22 of the Securities Act (15 U.S.C. §77v), and §27 of the Exchange Act (15 U.S.C. §78aa). The acts and transactions giving rise to the violations of law complained of occurred, in part, in this District, and certain Defendants reside and/or transact business in this District. In addition, Yatsen's ADS trade on the NYSE, which is in this District. Further, Yatsen's post-offering memorandum and articles of association designate this Court as "the exclusive forum within the United States for the resolution of any complaint asserting a cause of action arising out of or relating in any way to the federal securities laws of the United States."[4]

11. In connection with the acts and conduct alleged in this complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate wire and telephone communications and the facilities of the NYSE.

---

[4] Prospectus at 222.

## CLASS ACTION ALLEGATIONS

12. Lead Plaintiffs bring this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, Yatsen ADS during the Class Period, including in or traceable to the IPO (the "Class"). Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Yatsen, members of Yatsen's Board, and members of their immediate families (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entities in which Defendants have or had a controlling interest, or any affiliate of Yatsen.

13. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's ADS were actively traded on the NYSE, a national securities exchange. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of members in the Class. Millions of Yatsen shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Yatsen or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

14. Lead Plaintiffs' claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws. Further, Lead Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation.

5

15.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the members of the Class are:

(a)     whether the Exchange Act Defendants (as defined herein) violated the Exchange Act;

(b)     whether the Securities Act Defendants (as defined herein) violated the Securities Act;

(c)     whether Defendants' statements to the investing public during the Class Period were untrue and/or omitted material facts;

(d)     whether the Exchange Act Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     whether the price of Yatsen's ADS was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

16.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SECURITIES ACT CLAIMS

### A.    The Securities Act Parties

#### 1.    Lead Plaintiffs

17.    Lead Plaintiffs purchased Yatsen ADS during the Class Period pursuant and/or traceable to the Company's IPO, as described in the Certifications previously filed with the Court[5] and incorporated herein by reference and suffered damages as a result of the violations of the federal securities laws alleged herein.  Lead Plaintiffs suffered economic losses when the true facts about the Company's business, financial condition, and operations were disclosed, and the artificial inflation was removed from the price of Yatsen's ADS.

#### 2.    Securities Act Defendants

##### a.    Yatsen

18.    Defendant Yatsen is a China-based holding company engaged in the production and sale of cosmetics and skincare products.  Yatsen conducted its IPO in the state of New York, and its ADS are listed on the NYSE under the ticker symbol "YSG."

##### b.    The Individual Defendants

19.    Defendant Jinfeng Huang ("Huang") is Yatsen's founder, Chairman of the Board of Directors (the "Board"), and Chief Executive Officer ("CEO").  Prior to, and following the IPO, Huang owned more than 50% of Yatsen's total voting power and, therefore, Yatsen was a "controlled company" within the meaning of the NYSE Listed Company Manual.  Defendant Huang reviewed, contributed to, and signed the Offering Documents and made numerous materially false and misleading statements concerning Yatsen and its business prospects as detailed herein.

---

[5]    ECF Nos. 36-3 and 50-3.

20. Defendant Yuwen Chen ("Chen") is Yatsen's co-founder, Chief Operating Officer ("COO") and a Board member. Defendant Chen reviewed, contributed to, and, through his appointed attorney-in-fact, Jinfeng Huang, signed the Offering Documents.

21. Defendant Jianhua Lyu ("Lyu") is Yatsen's co-founder, Chief Sales Officer ("CSO") and a Board member. Defendant Lyu reviewed, contributed to, and, through his appointed attorney-in-fact, Jinfeng Huang, signed the Offering Documents.

22. Defendant Donghao Yang ("Yang") is Yatsen's Chief Financial Officer ("CFO") and a Board member. Defendant Yang reviewed, contributed to, and, through his appointed attorney-in-fact, Jinfeng Huang, signed the Offering Documents and made numerous materially false and misleading statements concerning Yatsen and its business prospects as detailed herein.

23. Defendant Sidney Xuande Huang ("Huang") agreed to serve as a director of Yatsen upon the SEC's declaration that the Registration Statement was effective and consented to the references to his name in the Offering Documents indicating that he had agreed to become a director of the Company. As a result, he is liable pursuant to Section 11(a)(3) of the Securities Act for the material untrue statements and omissions in the Offering Documents detailed herein.

24. Defendant Bonnie Yi Zhang ("Zhang") agreed to serve as a director of Yatsen upon the SEC's declaration that the Registration Statement was effective and consented to the references to her name in the Offering Documents indicating that she had agreed to become a director of the Company. As a result, she is liable under Section 11(a)(3) of the Securities Act for the material untrue statements and omissions in the Offering Documents detailed herein.

25. The Defendants named in ¶¶19-24 above are collectively referred to herein as the "Individual Defendants."

8

### c.    The Underwriter Defendants

26.    The following firms were members of the underwriting syndicate in connection with the IPO who agreed to purchase the ADS offered in the IPO for sale to investors:

| | |
|---|---|
| Morgan Stanley & Co. LLC | 22,912,500 |
| Goldman Sachs (Asia) L.L.C. | 22,912,500 |
| China International Capital Corporation Hong Kong Securities Limited | 7,050,000 |
| Tiger Brokers (NZ) Limited | 2,937,500 |
| China Renaissance Securities (Hong Kong) Limited | 1,762,500 |
| Futu Inc. | 1,175,000 |

27.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's untrue and misleading Offering Documents.  Morgan Stanley served as a joint bookrunner of the Offering, and as a representative of all the underwriters.  Defendant Morgan Stanley is headquartered in New York, New York.

28.    Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's untrue and misleading Offering Documents.  Goldman Sachs served as a joint bookrunner of the Offering, and as a representative of all the underwriters.  Goldman Sachs also agreed to offer ADS in the United States through its SEC-registered broker-dealer affiliate in the United States, Goldman Sachs & Co. LLC ("Goldman Sachs (USA)").  Goldman Sachs (USA) is headquartered in New York, New York.

29.    Defendant China International Capital Corporation Hong Kong Securities Limited ("China International") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's untrue and misleading Offering Documents.  China International served as a joint bookrunner of the Offering, and as a representative of all the underwriters.

9

30. Defendant Tiger Brokers (NZ) Limited ("Tiger Brokers") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's untrue and misleading Offering Documents.

31. Defendant China Renaissance Securities (Hong Kong) Limited ("China Renaissance") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's untrue and misleading Offering Documents.

32. Defendant Futu Inc. ("Futu") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's untrue and misleading Offering Documents.

33. The Defendants listed in ¶¶27-32 are collectively referred to herein as the "Underwriter Defendants."

34. Pursuant to the Securities Act, each Underwriter Defendant is liable for the materially inaccurate, misleading, and incomplete statements in the Offering Documents. In addition, although not an element of Lead Plaintiffs' Securities Act claims and an issue on which each Underwriter Defendant bears the burden of proof, to the extent any Underwriter Defendant seeks to assert it as an affirmative defense, no Underwriter Defendant conducted an adequate due diligence investigation in connection with the matters alleged herein and will accordingly be unable to establish a statutory "due diligence" affirmative defense under the Securities Act. Each Underwriter Defendant committed acts and omissions that were a substantial factor leading to the harm complained of herein.

10

35.     Each Underwriter Defendant named herein is an investment banking firm whose activities include, *inter alia*, the underwriting of public offerings of securities.  As the underwriters of the Offering, the Underwriter Defendants earned lucrative underwriting fees.

36.     Representatives of the Underwriter Defendants assisted Yatsen and the Individual Defendants in planning the Offering.  They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

37.     In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to Yatsen's management, directors, and lawyers to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which Yatsen's ADS would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about Yatsen would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Yatsen's management, directors, and lawyers, at a minimum, the Underwriter Defendants should have known of Yatsen's undisclosed ***then-existing*** problems, and the Offering Documents' materially inaccurate, misleading, and incomplete statements and omissions, as detailed herein.

38.     The Underwriter Defendants also demanded and obtained an agreement from Yatsen under which Yatsen agreed to indemnify and hold the Underwriter Defendants harmless from any liability under the Securities Act.

39. The Underwriter Defendants caused the Offering Documents to be filed with the SEC and declared effective in connection with the Offering, so that they, and the Individual Defendants, could offer to sell, and did sell, Yatsen shares to Lead Plaintiffs and the members of the Securities Act Class pursuant (or traceable) to the Offering Documents.

### d. Additional Securities Act Defendants

40. Defendant Colleen A. DeVries ("DeVries") served as Senior Vice President of Defendant Cogency Global Inc. ("Cogency Global"), the designated authorized U.S. representative of Defendant Yatsen in the United States and signed the Offering Documents. As a result, DeVries is liable pursuant to Section 11(a)(1) of the Securities Act for the material untrue statements and omissions in the Offering Documents detailed herein.

41. As DeVries' employer, Defendant Cogency Global, is liable for the Securities Act violations committed by Defendant DeVries, in its capacity as employer and as a control person under the Securities Act.

42. Yatsen, the Individual Defendants, the Underwriter Defendants, Cogency Global, and DeVries are collectively referred to herein as the "Securities Act Defendants."

### B. Substantive Allegations

#### 1. Background

43. Since its founding in 2016, Yatsen has launched and/or acquired several color cosmetics and skincare brands, including *Perfect Diary*, *Little Ondine*, *Abby's Choice*, *Galénic*, *DR. WU*, *Eve Lom*, *Pink Bear*, and *EANTiM*.[6] At the time of the IPO, Yatsen's brand portfolio consisted of *Perfect Diary* and *Little Ondine*, both color cosmetics brands, along with skincare brands *Abby's Choice* and the recently acquired *Galénic*.

---

[6] Yatsen Holding Limited Form 20-F for the fiscal year ended December 31, 2021 at 67.

12

44. Launched in 2017, *Perfect Diary* is Yatsen's flagship brand focused on Gen-Z consumers in the mass market segment.[7] Yatsen's second brand, *Little Ondine*, which was acquired in 2019, targets young women with more sophisticated beauty routines and higher purchasing power in Tier 1 and Tier 2 cities in China.[8] *Abby's Choice*, a home-grown skincare-focused brand, offers products at masstige price points, while *Galénic*, acquired in October 2020 from Pierre Fabre, a French pharmaceutical and dermo-cosmetics group, was Yatsen's first premium skincare brand.[9]

45. Yatsen experienced significant growth prior to the IPO. According to the Prospectus, the Company's net revenues increased from RMB635.3 million in 2018 to RMB3.0 billion in 2019 and were RMB3.27 billion for the nine months ended September 30, 2020, the last quarter before the Offering.[10] In 2018 and 2019, *Perfect Diary* accounted for 100% and 98.3%, respectively, of Yatsen's sales.[11] Although this percentage fell to 82.1% for the nine months ended September 30, 2020 due to the acquisition and re-launch of *Little Ondine*, at the time of the IPO, *Perfect Diary* remained Yatsen's most important brand.[12]

46. Yatsen attributed its pre-IPO success to its ability to rapidly launch and scale multiple brands using its digitally native direct-to-consumer ("DTC") business model to sell its

---

[7]     Prospectus at 161.

[8]     Prospectus at 156. China's city tier system categorizes the country's cities based on economic development, infrastructure, amenities, and population size. The country's four Tier 1 cities – Beijing, Shanghai, Guangzhou, and Shenzhen – are the most developed and have GDP in excess of $300 billion and populations of over 15 million people with high levels of income. *See* Dorcos Wong, *China's City-Tier Classifications: How Does it Work?*, CHINA BRIEFING (Feb. 27, 2019), https://www.china-briefing.com/news/chinas-city-tier-classification-defined/. Tier 2 cities are smaller with GDP of between $68 billion and $299 billion and populations of 3 to 5 million people. *Id.*

[9]     Prospectus at 159.

[10]    Prospectus at 18.

[11]    Prospectus at 160.

[12]    *Id.*

13

products directly to end consumers through various DTC online channels as well as the Company's network of offline "experience stores," which were introduced in 2019 and numbered over 200 across more than 90 cities in China at the time of the Offering. The Company's DTC online channels include its online stores operated on Alibaba's Tmall, the main source of the Company's sales, as well as social media platforms with e-commerce capabilities that engage consumers through live streaming, short videos, and mini programs using a broad range of Key Opinion Leaders ("KOLs") and celebrity partners.[13] These social media platforms include (i) video-sharing apps Douyin (China's TikTok), Kuaishou, and BiliBili; (ii) RED (Xiaohongshu), a platform akin to Instagram, and (iii) Weixin (WeChat), an instant messaging, social media and instant payment app developed by Tencent.[14] Using these channels and platforms popular with its brands' target demographics, Yatsen marketed its products through co-branding partnerships with other popular brands, celebrity endorsements, including by the acclaimed Chinese actress Zhou Xun, who also represented global labels such as Dior and Chanel, and the efforts of its network of close to 15,000 KOLs.[15]

47. According to the Prospectus, Yatsen's DTC model drove customer engagement with the Company's brands and allowed Yatsen to acquire insights into consumer preferences and behavior which the Company used to develop new products and content and improve the customer experience.[16] Yatsen claimed that this model allowed it to more efficiently price its products at a

---

[13] Prospectus at 115, 172.

[14] *Id.*; *Tmall: The Ultimate Guide*, ECOMMERCE CHINA (April 23, 2021), https://marketingtochina.com/tmallthe-ultimate-guide/; *What is RED (Xiaohongshu) And How Can It Unlock A New Revenue Stream*, FORBES (May 16, 2022), https://www.forbes.com/sites/forbesagencycouncil/2022/05/16/what-is-red-xiaohongshu-and-how-can-it-unlock-a-new-revenue-stream/?sh=3853b7164a61.

[15] Prospectus at 155, 170-71; *Perfect Diary: A Once-Thriving Cosmetics Brand's Decline and Lessons Learned*, DAXUE CONSULTING (March 24, 2023), https://daxueconsulting.com/perfect-diary-case-study-how-this-chinese-makeup-brand-got-to-the-top/.

[16] Prospectus at 109.

level attractive to its customers, maintain a healthy gross margin for its business, and develop new and popular products faster and more efficiently than its competitors, resulting in "a large and loyal customer base" with "strong and improving repeat purchase rates among [its] DTC purchase cohorts" that were "higher . . . than average across [Yatsen's] peers."[17]

48.     Although Yatsen also sold its products to e-commerce platforms and offline distributors, primarily JD.com and Vipshop, for resale to end customers, at the time of the IPO, over 86% of Yatsen's net revenues were generated through DTC channels.[18]

49.     While Yatsen credited its substantial pre-IPO revenue growth to the success of its DTC model, the downside of the Company's DTC strategy was its considerable cost, especially given the competitive digital marketing landscape in China.

### 2.     Growth of Yatsen's Principal Brands Had Stalled Before the IPO

50.     By the time of the IPO, *Perfect Diary's* monthly sales volume on Tmall/Taobao had been generally trending downward throughout 2020 falling from 4.2 million units in January 2020 to 1.6 million units in October 2020.  Significantly, this decline continued through Q32020, resulting in Tmall/Taobao sales revenue for *Perfect Diary* of just RMB493.8 million, nearly 26% below the RMB666.7 million in sales revenue in the corresponding period in 2019, and into October 2020 notwithstanding the rebound in consumer sentiment in China from the effects of the pandemic that the Prospectus acknowledges began in Q32020.[19]

---

[17]     Prospectus at 110, 154.

[18]     Prospectus at 114-15.

[19]     Prospectus at 113.

15



51.     Although *Perfect Diary's* monthly sales volume on Tmall/Taobao increased in November 2020 due to the Singles' Day holiday, the brand's sales volume was essentially flat this month versus the prior year period, increasing just 0.21% year-over-year from approximately 10.6 million units in November 2019 to approximately 10.7 million units in November 2020.

52.     Thereafter, although there were isolated upticks, including in June and November 2021, the months of China's two most prominent shopping holidays, *Perfect Diary's* monthly sales volume on Tmall/Taobao generally continued to decline during the period from December 2020 through December 2021.

16



53.     At the same time, after initially rebounding from the effects of the pandemic, beginning in August 2020, with the exception of the Singles' Day month of November 2020, monthly sales revenues on Tmall/Taobao for Yatsen's second-most important brand, *Little Ondine*, declined sharply.



17

54.     A research report published by Sandalwood Advisors on January 25, 2022, that analyzed data from JD.com, Pinduoduo (PDD), Douyin, and Kuaishu, in addition to Tmall, confirms the overall downward trend with respect to global online sales of Yatsen's two largest brands:



Yatsen Global Online* Sales By Brand (m RMB)

*China Online data refers to Tmall, JD, PDD, Douyin, Kuaishou data combined.

55.     There were several reasons growth of Yatsen's core brands had stalled and begun declining by the time of the IPO. As an initial matter, as Yatsen management acknowledged, by the time of the Offering, *Perfect Diary's* color cosmetics business had hit its ceiling in terms of reaching its target demographic through available DTC channels. In this regard, *The Paper*, a Chinese digital newspaper owned and operated by the Shanghai United Media Group, reported that, in a conference call organized by a brokerage firm, *Perfect Diary* mid-level and senior management had reasoned that "[t]here [were] approximately 250 million women aged 18-25 in [China]" and, "[a]fter excluding women who do not wear makeup or have high net worth, about

18

120 million, Perfect Diary reaches about 40 million consumers, a coverage rate of about 35%-40%."[20]

56.     In addition, in 2020, Yatsen faced heightened competition.  Both domestic and well-known overseas beauty brands had successfully co-opted *Perfect Diary's* marketing strategies, spending heavily on KOLs and using new platforms and live streaming to promote their brands. In this regard, *The Paper* reported that data from the CICC Research Institute indicated that Shiseido, L'Oreal, and Estee Lauder, three of the world's top five cosmetics companies, had all increased their sales in China by more than 60% in 2020, while *Perfect Diary's* sales grew by only 22%.[21]  As a result of this intense competition, by the time of the Offering, Yatsen was being forced to significantly increase its already high selling and marketing costs in order to continue to drive growth.  As a percentage of revenue, Yatsen's selling and marketing expenses were 48.7% and 41.3% in 2018 and 2019, respectively.[22]  For the nine months ending September 30, 2020, however, they had ballooned to 62.2% of net revenue[23] and hit 70% in Q42020[24] before climbing to an astounding 72% in Q12021.[25]  This level of promotional spending, which severely undermined profitability, was simply unsustainable for any length of time.

57.     Growth was further undermined by a lack of investment in research and development ("R&D").  Developing new products that would not only attract consumers but make them repeat purchasers was critical to Yatsen's continued growth.  However, as a percentage of

---

[20]     *Yixian E-commerce:  When Marketing Advantages Become a Constraint on Profitability, the Road to Transformation Through Acquisition of High-End Brands is Difficult*, THE PAPER (March 16, 2021), (https://www.thepaper.cn/newsDetail_forward_11713685).

[21]     *Id*.

[22]     Prospectus at 116.

[23]     *Id*.

[24]     Yatsen Holding Limited Form 6-K for the month of March 2021, Ex. 99.1.

[25]     Yatsen Holding Limited Form 6-K for the month of May 2021, Ex. 99.1.

revenue, R&D expenses were just 0.4% in 2018, 0.8% in 2019, and 1.3% for the nine months ended September 30, 2020.[26] In contrast, L'Oreal's R&D expenses in the first half of 2020 increased 7.1% year-over-year.[27] Although Yatsen launched new products rapidly prior to the IPO – 40 SKUs a month on average during January-September 2020 based on cosmetics filing data compared to the average of 10 SKUs a month by other leading brands[28] – product quality was an issue resulting in consumer dissatisfaction that weakened Yatsen's brand.[29] Moreover, data from China's National Medical Products Administration reflects that in the month of November 2020, *Perfect Diary* had registered its lowest number of new SKUs since Q12019 portending a continued slowing of and decline in growth following the IPO.[30]

58. In addition to the foregoing, increasing costs to open and operate more than 150 new offline experience stores in 2020 further undermined Yatsen's profitability. Indeed, by the time of the Offering, Yatsen was well on its way to reporting a stunning net loss of RMB2.68 **billion** in 2020, after having posted ***positive net income*** of RMB75 million in 2019.[31]

### C. Untrue and Misleading Statements and Omissions in the Offering Documents

59. On November 19, 2020, Defendants filed the final prospectus on Form 424B4 for Yatsen's IPO with the SEC. The Prospectus characterized Yatsen as "a leader in the rapidly

---

[26] Prospectus at 116.

[27] *Yixian E-commerce: When Marketing Advantages Become a Constraint on Profitability, the Road to Transformation Through Acquisition of High-End Brands is Difficult*, THE PAPER (March 16, 2021) (https://www.thepaper.cn/newsDetail_forward_11713685).

[28] "Yatsen Holding: C-Beauty Leader in the Making," Morgan Stanley (December 14, 2020), at 11.

[29] *Perfect Diary: A Once-Thriving Cosmetics Brand's Decline and Lessons Learned*, DAXUE CONSULTING (March 24, 2023), https://daxueconsulting.com/perfect-diary-case-study-how-this-chinese-makeup-brand-got-to-the-top/.

[30] "Yatsen Holding: C-Beauty Leader in the Making," Morgan Stanley (December 14, 2020), at 24.

[31] Prospectus at 116; 2020 Form 20-F at 89, 91, 93.

growing China beauty market" citing its "*three fast-growing,* successful color cosmetics and skincare brands, *Perfect Diary*, *Little Ondine*, and *Abby's Choice*."[32]  [Emphasis added].

60.  The Prospectus touted Yatsen's "*substantial growth*" since its founding.[33] [Emphasis added].  In this regard, the Prospectus stated that:

> Our gross sales increased from RMB757.7 million in 2018 to RMB3.5 billion in 2019, representing a growth rate of 363.7% or roughly 30 times the growth rate of the broader China beauty industry in terms of retail sales value over the same time period, according to the CIC Report.[34]  Our gross sales increased from RMB2.2 billion in the nine months ended September 30, 2019 to RMB3.8 billion in the nine months ended September 30, 2020, representing a growth rate of 70.2% or roughly 16 times the growth rate of the broader China beauty industry in terms of retail sales value over the same period, according to the CIC Report. . . .
>
> Our total net revenues increased substantially from RMB635.3 million in 2018 to RMB3,031.2 million (US$446.4 million) in 2019 and from RMB1,888.9 million in the nine months ended September 30, 2019 to RMB3,271.6 million (US$481.9 million) in the nine months ended September 30, 2020.[35]

61.  The Prospectus attributed the substantial increase in total net revenues for the nine months ended September 30, 2020 over the prior year period primarily "*to the growth in sales volume of our beauty products* . . . driven by . . . (i) *the introduction of innovative products and the expansion of product categories offered under our Perfect Diary brand*, [and] (ii) *the continued development of our Little Ondine brand*, . . . and the introduction of our new brand Abby's Choice. . . ."[36]  [Emphases added].

---

[32]  Prospectus at 109.

[33]  *Id*.

[34]  The Prospectus relied heavily on information in an industry report dated November 2020 and a consumer survey, each commissioned by Yatsen and prepared by China Insights Consultancy ("CIC"), a third-party research firm, regarding China's beauty industry and Yatsen's market position in China.

[35]  Prospectus at 2.

[36]  Prospectus at 120.

62.     Stating that the "core capabilities" of Yatsen's DTC business model ***"have and will continue to enable us to efficiently and rapidly build and scale successfully brands and products,"***[37] the Prospectus touted Yatsen's ***"proven ability to launch and grow successful brands more rapidly than [its] peers"*** stating:

> ***Our first brand, Perfect Diary, became the No. 1 color cosmetics brand in terms of GMV on Tmall within 13 months of launch and was also the largest color cosmetics brand in China's online beauty market in terms of retail sales value in 2019, according to the CIC Report.  Our second brand, Little Ondine, achieved within eight months of relaunch the same level of monthly gross sales as Perfect Diary did in its first year and our third brand, Abby's Choice, achieved such level of monthly gross sales within just three months of official launch.***[38]  [Emphasis added.]

63.     The Prospectus also emphasized Yatsen's ***"large and loyal customer base"*** and its ***"strong and improving repeat purchase rates among [its] DTC customer cohorts"*** that the Prospectus claimed were ***"higher . . . than average across [Yatsen's] peers"*** and ***"continu[ed] to improve as [the Company] strengthen[ed] and [grew] [its] brand and product portfolio."***[39]

64.     Further, the Prospectus touted the ***"particularly high sales volumes during Tmall's 2020 Singles' Day event"*** immediately before the IPO, stating:

> ***Perfect Diary***: ***Sales volume under Perfect Diary continued to grow rapidly as we introduced innovative products and expanded into new product categories such as skincare.  In particular, during Tmall's 2020 Singles' Day Event***[[40] ***from November 1, 2020 to November 11, 2020, Perfect Diary achieved RMB600 million in GMV on Tmall and ranked No. 1 in the color cosmetics category in terms of GMV on Tmall for the second consecutive year since 2019, according to the CIC Report.***

---

[37]     Prospectus at 4.

[38]     *Id*.

[39]     Prospectus at 110, 154.

[40]     "Singles Day in China . . . is the largest shopping day in the world, bigger than Amazon's Prime Day and Black Friday combined."  *See* Frank Lavin, *Singles' Day 2022: What's Different?*, FORBES (Nov. 7, 2022), https://www.forbes.com/sites/franklavin/2022/11/07/singles-day-2022-whats-different/?sh=c80286a38cbd.

*Little Ondine*: *Sales volume under Little Ondine also continued to grow rapidly and it has proven itself to be a successful second brand for our platform. In particular, during Tmall's 2020 Singles' Day Event from November 1, 2020 to November 11, 2020, Little Ondine achieved RMB100 million in GMV on Tmall, according to the CIC Report.*

*Abby's Choice: Sales volume under Abby's Choice also continued to grow rapidly following its official launch in 2020. In particular, Abby's Choice achieved over RMB20 million in GMV on Tmall on the first day of Tmall's 2020 Singles' Day Event, according to the CIC Report.*[41] [Emphases added.]

65. Although the Prospectus acknowledged that Yatsen's total net revenues had "experienced slower-than-expected growth in the nine months ended September 30, 2020" due to the effects of the COVID-19 pandemic, it stated that *"[a]s the negative impact of COVID-19 in China gradually declined in the third quarter of 2020 and overall consumer sentiment and purchasing activities gradually resumed, the growth in [Yatsen's] total net revenues for the third quarter of 2020 rebounded" and were higher in the third quarter of 2020 compared to "the corresponding quarter in 2019*."[42] [Emphasis added.]

66. The foregoing statements in ¶¶59-65 were untrue and misleading because, as detailed in ¶¶50-58 above, by the time of the Offering, the *Perfect Diary* and *Little Ondine* brands were not "fast-growing." *Perfect Diary*'s monthly sales volumes on Tmall/Taobao generally had been trending downward from January through October 2020, and (ii) the brand's sales volume on Tmall/Taobao was flat year-over-year in November 2020, the month of the IPO and the all-important Singles' Day event. In addition, *Perfect Diary's* year-over-year sales revenues on Tmall/Taobao had declined nearly 26% from RMB666.7 million in Q32019 to just RMB493.8 million in Q32020. At the same time, although the Prospectus had touted *Little Ondine* as a second

---

[41]     Prospectus at 138.

[42]     Prospectus at 119-20.

23

growth engine for Yatsen that was purportedly on a quicker growth trajectory than *Perfect Diary* had enjoyed, monthly sales revenues of *Little Ondine* on Tmall/Taobao had declined sharply from August 2020 to October 2020.

67. Moreover, the Prospectus' statements that "growth in [Yatsen's] total net revenues for the third quarter of 2020 rebounded" and were higher in the third quarter of 2020 compared to "the corresponding quarter in 2019" were untrue and misleading in light of the underlying performance of Yatsen's two most important brands. In this regard, rather than rebounding and exceeding the corresponding quarter in 2019, year-over-year sales volume and sales revenue on Tmall/Taobao for Yatsen's *Perfect Diary* brand had ***declined significantly*** during each month of and for the quarter ended Q32020. Specifically, sales volume on Tmall/Taobao declined 17.08%, 34.73% and 52.35% in July, August, and September 2020, respectively, and was 38% lower in Q32020 than in the same period the prior year. Likewise, *Perfect Diary* sales revenue on Tmall/Taobao declined 10.73%, 25.82%, and 34.32% in the same months and was nearly 26% lower in Q32020 than in the same period the prior year.



24

68.     Further, the Prospectus' statements regarding *Perfect Diary's* introduction of new, innovative products and the expansion of its product offerings and Yatsen's "large and loyal customer base" and its higher-than-average repeat purchase rates were untrue and misleading because customer satisfaction was being undermined by poor product quality, which was adversely impacting sales volumes and repurchase rates.  In addition, fewer and less rapid new product launches were on the horizon in the months following the IPO which would continue to undermine growth.

**D.     The Offering Documents Failed to Adequately Disclose Material Known Trends and Uncertainties in Violation of SEC Regulations**

69.     In addition to the foregoing reasons, the failure of the Offering Documents to disclose the material adverse information in ¶¶50-58 above also violated Item 303 of SEC Regulations S-K.  Item 303 imposed an independent duty on the Securities Act Defendants to disclose in the Offering Documents "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition."  As of the time of the IPO and the issuance of the Offering Documents, Defendants were aware, but did not disclose, that sales in Yatsen's core brands had stalled and/or were declining and that such deterioration was likely to have a material adverse effect on Yatsen's future performance.  The undisclosed negative trends and uncertainties detailed in ¶¶50-58 each were reasonably expected to have a material unfavorable impact on Yatsen's business, sales, revenues, and profitability from continuing operations, and, therefore, were required to be (but were not) disclosed in the Offering Documents.

70.     The failure of the Offering Documents to disclose material adverse information also violated Item 105 of SEC Regulations S-K, 17 C.F.R. §299.105 ("Item 105").  Specifically, Item 105 provides, in pertinent part, that the "Risk Factors" section of offering documents filed with the SEC discuss the most significant factors that make an offering risky or speculative and that each risk factor adequately describes the risk.  The Offering Documents' discussion of the risk factors that made an investment in Yatsen risky or speculative were themselves materially misleading because they provide generic statements of potential or contingent risk yet fail to disclose that the potential future adverse impacts described were ***already*** occurring at the time of the IPO.

71.     For example, the Offering Documents purported to warn:

We have incurred significant costs for a variety of sales and marketing efforts, including mass advertising and heavy promotions to attract customers through multiple channels.  ***If we are unable to conduct sales and marketing efforts in a cost-effective and efficient manner, our results of operations and financial conditions may be materially and adversely affected. . . .***
As a relatively young company, we have invested, and will continue to invest, a large amount of financial and other resources in promoting our brand awareness and acquiring customers . . . .  ***We may . . . not be able to continue our existing marketing and branding activities, or successfully identify and utilize the new trends in marketing strategies, channels and approaches that appeal or fit in the lifestyle of our targeted customers. . . .  Failure to refine our existing marketing strategies or introduce new effective marketing strategies in a cost-effective manner could negatively impact our business, results of operations and financial condition.***  [Emphases added].[43]

72.     By the time of the IPO, however, as detailed above (*see* ¶56), Yatsen's spending on selling and marketing had already become untenable and reductions in selling and marketing expenditures were inevitable.   Under Item 105, Defendants were required in the Offering Documents to disclose this and the likely impacts of a reduction of selling and marketing expenses on Yatsen's business.

---

[43]     Prospectus at 31-32.

**E.      Events Subsequent to the IPO**

73.      As detailed below (*see* ¶¶137-47), the truth with respect to *Perfect Diary's* and *Little Ondine's* growth trajectories became known to investors through a series of announcements by the Company between August 26, 2021 and March 10, 2022, disclosing that Yatsen's growth had stalled and/or turned negative.  The price of Yatsen's ADS fell precipitously in response.  By the commencement of this action, Yatsen's ADS traded as low as $0.39 per ADS, or over a 96% drop from the $10.50 offering price.  All told, investors have lost hundreds of millions of dollars.



**F.      Causes of Action**

<u>COUNT I</u>

**For Violations of §11 of The Securities Act**
**(Against All Defendants)**

74.      Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

75.      This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.  This is a non-fraud cause of action.  Lead Plaintiffs do

not assert that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

76. The Offering Documents are inaccurate and misleading, containing untrue statements of material facts, omitting facts necessary to make the statements made therein not misleading, and omitting to state material facts required to be stated therein.

77. The Company is the registrant of the securities purchased by Lead Plaintiffs and the Class. As such, the Company is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate. By virtue of the Offering Documents containing untrue statements and omissions of material fact necessary to make the statements therein not misleading, Yatsen is liable under §11 of the Securities Act to Lead Plaintiffs and the Class.

78. The Individual Defendants each signed the Offering Documents and/or were identified, with their consent, as director designees in the Offering Documents, becoming Directors on Yatsen's Board upon the SEC declaring the Offering Documents effective, and caused the Offering Documents to be issued. As such, each is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents and to ensure that they were true and accurate, there were no omissions of material facts that would make the Offering Documents misleading, and the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the untrue statements of material fact contained in the Offering Documents, and

28

also should have known of the omissions of material fact necessary to make the statements made therein not misleading. Accordingly, the Individual Defendants are liable to Lead Plaintiffs and the Class.

79. The Underwriter Defendants each served as underwriters in connection with the Offering. As such, each is strictly liable for the materially inaccurate statements contained in the Offering Documents, and the failure of these documents to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. The Underwriter Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents. They had a duty to ensure that such statements were true and accurate, there were no omissions of material facts that would make the Offering Documents misleading, and the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Underwriter Defendants should have known of the untrue statements of material fact contained in the Offering Documents, and also should have known of the omissions of material facts necessary to make the statements made therein not misleading. Accordingly, each of the Underwriter Defendants is liable to Lead Plaintiffs and the Class.

80. Defendant DeVries, on behalf of Cogency Global, the U.S. representative identified in the Offering Documents, signed the Offering Documents as Cogency's Senior Vice President. As such, Cogency Global and DeVries are strictly liable for the materially inaccurate statements contained in Offering Documents, and the failure of these documents to be complete and accurate, unless both are able to carry their burden of establishing an affirmative "due diligence" defense. Cogency Global, and Defendant DeVries as an employee representative of Cogency Global, each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the

29

statements contained in the Offering Documents and to ensure that they were true and accurate, there were no omissions of material facts that would make the Offering Documents misleading, and the documents contained all facts required to be stated therein. In the exercise of reasonable care, both Cogency Global and Defendant DeVries should have known of the untrue statements of material fact contained in the Offering Documents and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. Accordingly, Cogency Global and Defendant DeVries are both liable to Lead Plaintiffs and the Class.

81.     Defendants acted negligently in preparing the Offering Documents. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omission of any material facts and were not misleading. In alleging the foregoing, Lead Plaintiffs specifically disclaim any allegation of fraud.

82.     By reasons of the conduct herein alleged, each Defendant named in this Count violated §11 of the Securities Act.

83.     None of the untrue statements or omissions of material fact in the Offering Documents alleged herein was a forward-looking statement. Rather, each such statement concerned existing facts. Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of these statements.

84.     Lead Plaintiffs and Class members sustained damages when the price of the Company's ADS declined substantially due to the untrue statements and omissions of material fact in the Offering Documents.

85.     This Count is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

86.     By virtue of the foregoing, Lead Plaintiffs and the other members of the Class are entitled to damages under §11, as measured by §11(e), from the Defendants and each of them, jointly and severally.

## COUNT II

### For Violations of §15 of the Securities Act
### (Against the Individual Defendants and Cogency Global)

87.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

88.     This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against each of the Individual Defendants and Cogency Global.

89.     Yasen and Defendant DeVries were culpable participants in the violations of Section 11 of the Securities Act alleged in Count I above.

90.     The Individual Defendants were controlling persons of Yatsen within the meaning of §15 of the Securities Act.  By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, the Individual Defendants, individually and collectively, had the power to influence, and exercised same over the Company to cause it to engage in the conduct complained of herein.

91.     Likewise, Cogency Global controlled Defendant DeVries, who signed the Registration Statement at the direction of Cogency Global, in her capacity as an employee representative of Cogency Global.

92.     Yatsen, the Individual Defendants, Cogency Global and DeVries were culpable participants in the violations of §11 of the Securities Act alleged in the First Cause of Action above.

31

93.     As control persons, each of the Defendants named in this Count are jointly and severally liable pursuant to §15 of the Securities Act with and to the same extent as Yatsen and DeVries for their violations of §11 of the Securities Act.

## EXCHANGE ACT CLAIMS

### A.     The Exchange Act Parties

#### 1.     Exchange Act Plaintiffs

94.     Lead Plaintiffs purchased Yatsen ADS during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged below.

#### 2.     Exchange Act Defendants

95.     Defendant Yatsen is a China-based holding company engaged in the production and sale of cosmetics and skincare products.  Yatsen's ADS are traded on the NYSE under the ticker symbol "YSG."

96.     Defendant Huang is Yatsen's founder, Chairman and CEO and, at all relevant times, owned more than 50% of Yatsen's total voting power.  As detailed herein, Defendant Huang acted on Yatsen's behalf and/or made materially false and misleading statements in the Offering Documents, the Company's press releases filed with the SEC announcing Yatsen's earnings for Q42020 and FY2020, Q12021, Q22021, Q32021 and during calls with securities analysts to discuss these results.

97.     Defendant Yang is Yatsen's CFO and a Board member.  As detailed herein, Defendant Yang acted on Yatsen's behalf and/or made materially false and misleading statements in the Offering Documents, the Company's press releases filed with the SEC announcing Yatsen's earnings for Q42020 and FY2020, Q12021, Q22021, Q32021 and during calls with securities analysts to discuss these results.  Defendant Yang also signed each of the Forms 6-K that included the materially false and misleading press releases.

32

98.     Together, Defendants Yatsen, Huang, and Yang are referred to as the Exchange Act Defendants and Defendants Huang and Yang are referred to as the "Individual Exchange Act Defendants."

## B.     Post-IPO Background

99.     Lead Plaintiffs incorporate by reference ¶¶43-58 above as if fully set forth herein.

100.     Following the IPO, Yatsen acquired three additional skincare brands.  In January 2021, Yatsen completed the acquisition of the mainland China business of Taiwan skincare brand *Dr. Wu*.  On March 2, 2021, Yatsen announced that it had entered into a definitive agreement to acquire prestige skincare brand *Eve Lom*.  Finally, in October 2021, Yatsen acquired *EANTiM*, a professional-channel skincare brand,

101.     These acquisitions were part of an effort by Yatsen to buttress its net revenue growth in the face of the stalling and declining growth of its *Perfect Diary* and *Little Ondine* color cosmetics brands and improve the Company's margins and profitability, which had been adversely impacted by Yatsen's ballooning selling and marketing expenditures.

## C.     False and Misleading Statements and Omissions Giving Rise to Liability Under the Exchange Act

102.     Lead Plaintiffs incorporate by reference ¶¶59-68, 71-72 above, which detail untrue statements and omissions of material fact contained in the Prospectus that form the basis of Lead Plaintiffs' Securities Act Claims.  Each of the statements and omissions in the Prospectus set forth above were knowingly or recklessly false and misleading for the following reasons:  (i) growth of the *Perfect Diary* and *Little Ondine* brands, which accounted for the vast majority of Yatsen's revenues, was declining and/or had stalled in the months before the IPO as detailed in ¶¶50-58 above contrary to the Prospectus' representation that they were "fast-growing" and that growth had rebounded in Q32020 from the impact of the pandemic; (ii) Yatsen had driven selling and

33

marketing expenditures to unprecedented levels by the time of the Offering in order to drive growth prior to the IPO, but this level of expenditure was unsustainable; and (iii) Yatsen's enormous promotional spending had hampered its ability to rapidly develop new products, which was necessary to drive growth as evidenced by the fact that Yatsen had registered its lowest number of new SKUs since Q12019 with China's National Medical Products Administration. As Defendants knew, but recklessly disregarded, reducing selling and marketing expenses and failing to introduce new products at the Company's previous pace would adversely impact sales and net revenues in future periods especially given China's hyper competitive beauty market.

103. In addition, following the IPO, Yatsen and the Individual Exchange Act Defendants continued to knowingly and/or recklessly make materially false and misleading statements and omissions concerning Yatsen's growth and business prospects as detailed in ¶¶104-40 below.

### 1. Yatsen's Q4 and FY 2020 Financial Results

104. On March 11, 2021, Yatsen issued a press release reporting its fourth quarter and full year 2020 financial results, the Company's first financial results as a publicly traded company, and issuing guidance for Q12021. The press release was attached as an exhibit to a Form 6-K signed by Defendant Yang filed with the SEC the same day. The release reported year-over-year net revenue growth of 71.7% in Q42020 from the prior year period and Q42020 selling and marketing expenses of RMB1.38 billion, an astounding 70% of net revenues, as well as a net loss for the quarter of over RMB1.5 *billion*. The release also issued guidance of 35% to 40% year-over-year net revenue growth for Q12021.

105. The release quoted Defendant Huang as stating that Yatsen's ***"efforts to scale [its] brands and unlock synergies between [its] various sales channels"*** had "resulted in ***powerful top-line growth***." [Emphasis added]. In addition, Defendant Huang was quoted as stating that Yatsen was "***well positioned" to capture the "unprecedented opportunities" presented by "[t]he growing***

*popularity of homegrown Chinese beauty brands*." [Emphasis added]. In this regard, Defendant Huang pointed to Yatsen's acquisition of several skincare brands that purportedly *put the Company "on track to offer [its] customers a full suite of products,"* Yatsen's *"focus on innovation and quality," and* the *expansion of the Company's network of offline experience stores, which Defendant Huang stated would "create even greater value for [Yatsen's] customers and spur stronger brand engagement and loyalty*." [Emphasis added]. Defendant Huang concluded his quoted remarks by stating that Yatsen "*look[ed] forward to introducing effective skincare regimens and new color cosmetics consisting of an even fuller array of colors and textures" in 2021*. [Emphasis added].

106. In the press release, Defendant Yang applauded the Company's "*healthy* top line growth" in Q42020, which he claimed reflected, "*strong performance across [Yatsen's] brand portfolio*," including *Perfect Diary* and *Little Ondine*, "*demonstrate[d] the deep market appeal of [its] products, the success of [Yatsen's] growth strategy, and [the Company's] ability to skillfully execute [its] operational plan*." [Emphasis added].

107. That same day, Yatsen hosted an analyst call regarding its Q4 and FY2020 results. At the outset of the call, Defendant Huang declared that throughout 2020, Yatsen had *"leveraged [its] past successes to further fortify [its] leading position in color cosmetics in [Gen-Z and] millennial customers*." [Emphasis added]. In this regard, Defendant Huang touted "*Yatsen's firm commitment . . . to product innovation and development, [and] enhancing [its] brand portfolio and product offerings" as having "position[ed] [Yatsen] as an unique and competitive player in China's fast-growing beauty industry*." [Emphasis added]. According to Huang, Yatsen's Q42020 results were **"*a testament to [its] ability to quickly grow [its] business as evidenced by the accelerated expansion of [its] flagship brand [Perfect] Diary and the rapid growth witnessed*

35

*by [its] other brands including Little Ondine and Abby's Choice, soon after being introduced into [the] portfolio*." [Emphasis added]. Huang cited "*the effectiveness of [Yatsen's] disruptive B2C business model*" as enabling Yatsen "*to consistently deliver innovative products and the personalized services that deepen[ed] customer engagement*" and the Company's "*strong R&D capabilities*" as having "*uniquely position[ed] Yatsen to play a leading role in*" China's beauty industry. [Emphasis added].

108. During the call, CFO Yang characterized Yatsen's top-line growth as *"healthy"* and reflective of *"the strong performance [the Company] achieved across [its] brand portfolio, . . . the deep market appeal of [its] products, success of [its] growth strategy and [its] ability to skillfully execute [its] operational plan."* [Emphasis added]. Defendant Yang acknowledged that Yatsen's profitability had been adversely impacted by increased selling and marketing and general and administrative expenses in 2020 but stated that *the Company's "efforts in product innovation and development [were] paying off" and that Defendants believed that continued execution of its strategy would "lay a solid foundation for profitability in the long run."* [Emphasis added].

109. In response to analysts' questions regarding the Company's disappointing Q12021 guidance of 35% to 40% year-over-year net revenue growth, Defendant Yang assured investors that Yatsen was "*continu[ing] to execute [its] strategies in terms of…[its] existing brands, Perfect Diary, Little Ondine, and Abby's Choice*" and "*continu[ing] to grow those brands.*" [Emphasis added]. However, Yang explained that:

> *[S]ome of the new products for existing brands like Perfect Diary, [and] Little Ondine will not be launched until Q2. And the contribution to our revenue from the newly acquired brands will not present themselves, will not show themselves in our financials starting from Q2.* [Emphasis added].

110. Nevertheless, Yang stated that the Exchange Act Defendants *"believe[d] that the growth rate of [the Company's] overall business [would] start to come back or pick up starting*

*from Q2 compared to Q1 . . . [s]o it's not like . . . Q1 growth rate year-over-year is representative of the growth rate for the full year."* [Emphasis added].

111. The foregoing statements in ¶¶105-10 above were materially false and misleading because as the Exchange Act Defendants knew, or recklessly disregarded, sales of Yatsen's *Perfect Diary* and *Little Ondine* brands had stalled and/or were declining at the time these statements were made. *Perfect Diary's* sales volume on Tmall/Taobao in Q42020 was essentially flat year-over-year, growing approximately 2.4% from RMB17.6 million units in Q42019 to just RMB18 million in Q42020. In addition, except for November 2020, which was positively impacted by the Singles' Day holiday, *Little Ondine's* sales revenues on Tmall/Taobao during Q42020 continued the downward trend that had begun prior to the Offering. In this regard, *Litle Ondine's* sales revenue on Tmall/Taobao fell from RMB80.6 million in September 2020 to RMB62.9 million in October 2020, and by December 2020 had fallen to just RMB 52.8 million. Moreover, Yatsen had to spend more to capture this meager growth. As noted above, in Q42020 selling and marketing expenses reached an astounding 70% of net revenues.

112. Thus, Yatsen was not "well positioned" to capture new opportunities in China's beauty market, the performance of *Perfect Diary* and *Little Ondine* in Q42020 was neither "healthy" nor "strong," and the growth of these brands was not "continuing." Further, although Defendant Yang blamed the disappointing Q12021 guidance of 35% to 40% net revenue growth on the timing of product launches with respect to the *Perfect Diary* and *Little Ondine* brands, and stated that the Exchange Act Defendants believed that the growth rate of the Company's business would pick up starting in Q22020 and going forward, the Exchange Act Defendants knew, but recklessly disregarded, that the reasons for Yatsen's substantially slower growth were deep-seated and that the necessary prerequisites for improving growth were not in place. Specifically, the level

37

of selling and marketing expenditures that had been necessary to fuel Yatsen's earlier strong growth was not sustainable due to the Company's mounting losses, but increased competition meant that achieving results similar to earlier periods required higher, not lower, selling and marketing expenditures. In addition, growth had been, and going forward would continue to be, adversely impacted by Yatsen's inability to timely launch new, quality products due to its insufficient investment in R&D. Thus, Defendant Yang's statements that the Exchange Act Defendants believed that the growth rate of Yatsen's business would "come back or pick up starting from Q2 compared to Q1" and that "Q1['s] growth rate year-over-year [was] representative of the growth rate for the full year" were completely at odds with the facts known to the Exchange Act Defendants at the time.

### 2. Yatsen's Q12021 Financial Results

113. On May 19, 2021, before the market opened, Yatsen released its Q12021 financial results and issued guidance for Q22021. The press release was attached as an exhibit to a Form 6-K signed by Defendant Yang filed with the SEC the same day. The release reported net revenue growth of 42.7% over the same period in 2020, 2% above the high end of Yatsen's earlier-issued guidance for Q12021. In addition, the release reported selling and marketing expenses of nearly $1.1 ***billion***, representing 72% of Yatsen's net revenues, and provided Q22021 net revenue guidance of between RMB1.49 billion and RMB1.54 billion, representing year-over-year growth of approximately 50% to 55%.

114. The release quoted Defendant Huang as stating that ***"[t]he year is off to a good start with robust topline growth,"*** which he attributed to ***"stellar performance of [Yatsen's] flagship Perfect Diary brand as well as robust growth from Little Ondine, Abby's Choice and other brands under Yatsen's portfolio."*** [Emphasis added].

115. The release also quoted Defendant Yang as stating that the Exchange Act Defendants believed *Yatsen's "leading market position and stellar operating performance position[ed] [the Company] well to achieve [its] strategic objectives this year and further capture the growth potential of China's beauty market."* [Emphasis added].

116. During an analyst call held the same day, Defendant Huang praised the performance of Yatsen's *Perfect Diary* and *Little Ondine* brands stating:

> *[W]e went into the year with a clear execution plan to optimize our brands' performance, expand our product portfolio and enhance our core capabilities. A key focus has been on the flagship Perfect Diary brand, particularly to upgrade its positioning and price point from mass to higher-end mass market in order to further expand its growth potential*. . . .
>
> *At the same time, we continued to introduce new products that excite and delight our customers* . . . .
>
> *These new products . . . represent[] refinement and premiumization of the Perfect Diary product line this year*. . . .
>
> * * *
>
> *Our masstige color cosmetic brand, Little Ondine, also experienced robust year-over-year growth in the quarter, powered by several well received product launches*, such as the crossover with Pop Mart and Chinese popstar, Huang Zhao, as well as the new vinyl record eyeshadow palette, which was introduced in late March. *Given Little Ondine's unique street fashion brand positioning, its further upside is expected to be lower than that of Perfect Diary, which we aim to develop further as a super-brand within the group*.
>
> *As Little Ondine has already become a top-selling color cosmetics brand in China's online market, for its next stage of growth, we plan to optimize the investment level in this brand with increased focus on sustainable growth going forward*. [Emphasis added].

117. Defendant Huang also emphasized that Yatsen had increased R&D spending during the quarter to almost 2% of net revenue.

118. In response to an analyst's question regarding whether Q22021 would likely be Yatsen's best quarter in terms of growth, Defendant Huang stated that the Exchange Act

39

Defendants believed the "*shift of the growth model [would] be more sustainable and more . . .*
*robust in the coming quarters.*"  [Emphasis added].

119.    The statements identified in ¶¶114-18 above were materially false and misleading
because, as the Exchange Act Defendants knew, or recklessly disregarded, sales of Yatsen's *Perfect*
*Diary* and *Little Ondine* brands had stalled and/or were declining at the time these statements were
made.  Specifically, *Perfect Diary's* month-over-month sales volumes and sales revenues on
Tmall/Taobao had *declined significantly* during each month of and for the quarter ended Q12021.
Specifically, *Perfect Diary's* sales volume on Tmall/Taobao in Q12021 was basically flat year-
over-year (10.95 million units in Q12021 versus 10.36 million units in Q12020) notwithstanding
the impact of the pandemic in 2020.  In addition, the brand's month-over-month sales volume in
Q12021 (i) declined 21% to 4.5 million units in January from 5.7 million units in December 2020;
(ii) declined 28% to 3.3 million units in February from 4.5 million units in January; and (iii)
declined 5% to 3.1 million units in March from 3.3 million units in February.  In addition, *Perfect*
*Diary's* month-over-month sales revenue in Q12021 (i) declined nearly 32% to RMB227.9 million
in January from RMB334.6 million in December 2020; (ii) declined nearly 1% to RMB226.6
million in February from RMB227.9 million in January; and (iii) declined nearly 10% to
RMB204.2 million in March from RMB226.6 million in February.  In sum, *Perfect Diary's*
performance during the quarter had been anything but "stellar" and the brand had not been
successfully repositioned for future growth.

120.    Likewise, far from being "robust," in Q12021 *Little Ondine's* sales revenue on
Tmall/Taobao had fallen to levels not seen since the height of the pandemic.  In this regard, *Little*
*Ondine's* sales revenues were RMB59 million, RMB31 million, and RMB51 million in January,
February, and March 2021, respectively, commensurate with levels seen during March, April and

40

May 2020, when *Little Ondine's* sales revenues ranged from RMB30.1 million to RMB57.3 million. Importantly, Lead Plaintiffs and investors were unaware of how *Perfect Diary* and *Little Ondine* were performing because the Exchange Act Defendants stopped providing a public breakdown of the Company's net revenues by brand after the IPO.

121. Moreover, Defendant Huang's statement touting Yatsen's increased investment in R&D was false and misleading because as the Exchange Act Defendants knew or recklessly disregarded, the level of Yatsen's R&D investment remained well below that of the Company's competitors and was insufficient to meaningfully change the rate or quality of new product launches.

### 3. Yatsen's Q22021 Financial Results

122. On August 26, 2021, before the market opened, Yatsen released its Q22021 financial results and issued guidance for Q32021. The press release was attached as an exhibit to a Form 6-K signed by Defendant Yang filed the same day. The release reported net revenue growth of 53.5% over the same period in 2020, the mid-range of Yatsen's earlier-issued guidance for Q22021. In addition, the release reported Q22021 selling and marketing expenses of RMB972.5 million, a quarter-over-quarter reduction of approximately 7%. The release also provided disappointing Q32021 net revenue guidance of between RMB1.33 billion and RMB1.39 billion, representing year-over-year growth of just 5% to 10%, which the release stated was ***"mainly attributable to the unusual quarterly seasonality pattern caused by the COVID-19 pandemic"*** ***the prior year***. [Emphasis added].

123. The release also quoted Defendant Huang as stating that Defendants were "***pleased***" with the Company's Q22021 performance, which he attributed in part to "***customer growth stemming from [its] flagship brand Perfect Diary***." [Emphasis added]. Defendant Huang was also quoted as stating that ***"[a]s [Yatsen's] color cosmetics and skincare brands resonate more***

41

*and more with consumers, [Yatsen was] confident and firmly committed to further boosting [its] market share among Gen-Z, Gen-A and an expanding group of luxury consumers and transforming Yatsen into a flourishing global multi-brand beauty group*." [Emphasis added].

124. The release quoted Defendant Yang as stating that Q20221 was "***another quarter of strong growth***." [Emphasis added].

125. In a call with securities analysts the same day, Defendant Huang reiterated the "***steady contribution from . . . [the] Perfect Diary brand***" as a factor in Q22021's net revenue growth. [Emphasis added]. Further, Defendant Huang stated that "***these solid results came despite intensifying competition and rising customer acquisition costs.***" [Emphasis added].

126. Defendant Huang also stated that Yatsen had been successful in improving ROI on its sales and marketing expenses noting "a decline in [Yatsen's] sales and marketing expenses to 51% of total net revenues based on non-GAAP measures compared to 71% last quarter and 62.7% in the fourth quarter of 2020." However, Defendant Huang acknowledged that Yatsen had "move[d] too fast to reallocate [its] talent into the skincare business unit" and stated that Yatsen "need[ed] to refocus and also devote more resources to continue the growth trends of [its] main brands."

127. Defendant Huang also sought to assuage investor concern with respect to the net revenue guidance of 5% to 10% issued for Q32021 stating that it was "***largely due to the unusual seasonality pattern caused by the COVID-19 pandemic last year***." [Emphasis added]. Defendant Huang explained:

> *So in a typical year, the China online beauty market is characterized by higher sales in Q2 than Q3. As a result of the June 18 promotions across all sales channels, this pattern was disrupted in 2020 due to social distancing and quarantine policies during the COVID-19 pandemic in Q2 followed by relatively stronger sales in Q3 as the market recovered, helped by the pent-up demand from*

42

*previous months. So this creates a low base in Q2 and a high base in Q3 for year-on-year comparisons this year.*

*However, if you compare our combined sales in Q2 and Q3 this year, which represent 53.5% and 5% to 10% based on our guidance year-over-year growth rate, respectively, the year-over-year growth is projected to be 26% to 29%. We believe this is a more accurate picture of our growth trend, taking last year's unusual seasonality into account. We expect to have a normal basis of comparison in Q4 and our year-over-year sales growth will resume its normal trajectory.*

*We are confident that successful execution of our strategic growth initiatives, our expanding talent pool and the ample financial results on our balance sheet position us well to continue playing a leading role in China's evolving beauty market.* [Emphasis added].

128. Later in the call, Defendant Huang returned to the issue of Q32021 guidance stating that *"we believe the Q1 to Q3 combined will be . . . [a] more accurate reflection of our growth expectation for quarters moving forward."* [Emphasis added].

129. Defendant Yang also highlighted the decrease in Yatsen's selling and marketing expenses as a percentage of revenues as the "*result of [the Company's] focus in improving the ROI on [its] selling and marketing expenses*." [Emphasis added].

130. In response to an analyst's question regarding whether the projected 5% to 10% growth rate for net revenue for Q32021 signaled that *Perfect Diary* "could be declining in third quarter," Defendant Yang stated, "*we still see a very healthy growth trend of Perfect Diary main brand*." [Emphasis added].

131. In response to a question from another analyst, Defendant Haung acknowledged that Yatsen had seen "slower growth [in July] versus the previous months" which was below the Company's expectations. In this regard, Defendant Huang stated that "in the past 12 months beginning last June to this June . . . the whole cosmetic industry growth was mainly driven by skincare and also premium brands growth, . . . [b]ut *looking forward, . . . if you look at the August*

*data, . . . we still have the confidence on the color cosmetics growth as we see some newly emerging channels booming*." [Emphasis added]. In addition, Defendant Huang stated that in the second half of 2021 investors would "*see a higher frequency of launch of new products*." [Emphasis added].

132. The statements identified in ¶¶122-31 above were materially false and misleading because as the Exchange Act Defendants knew, or recklessly disregarded, sales of Yatsen's *Perfect Diary* and *Little Ondine* brands had stalled and/or were declining at the time these statements were made. Contrary to Defendant Yang's statement that *Perfect Diary's* growth trend was "healthy," the brand's sales volume and sales revenue on Tmall/Taobao were both down quarter-over-quarter. *Perfect Diary's* Q22021 sales volume of 10.25 million units on Tmall/Taobao was approximately 6.4% below Q12021's 10.95 million units. In addition, the brand's Q22021 sales revenues of RMB609 million on Tmall/Taobao were 7.5% below Q12021 (RMB658.7 million) and approximately 4% below Q22019's pre-pandemic RMB633.9 million. Moreover, the Exchange Act Defendants' statements touting the reduction in selling and marketing expenses was misleading because it omitted to disclose that Yatsen's commitment to reducing promotional expenses portended lower growth for the brand going forward given the intense competition in the market.

133. In addition, *Little Ondine's* year-over-year sales revenue on Tmall/Taobao continued to spiral downward in Q22021 once again falling to levels commensurate with the worst days of the pandemic. In this regard, *Little Ondine's* Q22021 sales revenues on Tmall/Taobao were RMB32 million, RMB27.8 million, and RMB43.9 million in April, May, and June 2020, respectively, representing year-over-year declines of 25%, 52%, and 43% for these months, and an overall year-over-year decline of nearly 42% in Q22021 to RMB103 million from RMB177.5

44

million in the corresponding period the prior year.  Thus, Yatsen's color cosmetics products were not "resonating" with consumers and there was nothing "pleasing" about the Q22021 performance of Yatsen's two most important brands.

134.    In view of the foregoing, the Exchange Act Defendants lacked a reasonable basis to believe in the positive, forward-looking outlook they presented to investors.  Further, Defendant Huang's statements that the lower growth guidance for Q32021 "was largely due to the unusual seasonality pattern caused by the COVID-19 pandemic last year" and that Yatsen expected its "year-over-year sales growth [would] resume its normal trajectory" in Q42021 were knowingly or recklessly false and misleading because the Exchange Act Defendants knew that Q32021's low guidance was the result of the poor performance of its core color cosmetics brands, *Perfect Diary* and *Little Ondine*, and was not the result of an unusually high comparator in Q32020 for the reasons detailed in ¶¶66-67 above.

### 4.    Yatsen's Q32021 Financial Results

135.    On November 17, 2021, before the market opened, Yatsen released its Q32021 financial results and issued guidance for Q42021.  The press release was attached as an exhibit to a Form 6-K signed by Defendant Yang filed with the SEC the following day.  The release reported net revenue growth of just 6% over the same period in 2020, the low end of Yatsen's earlier-issued guidance of 5% to 10% for Q32021, and selling and marketing expenses for the quarter of RMB911.3 million.  Moreover, the release shocked the market by providing Q42021 net revenue guidance of between RMB1.57 billion and RMB1.67 billion, representing a year-over-year *decline* of approximately 15% to 20%.

136.    In the release, Defendants Huang and Yang touted that Yatsen's "*topline continued to grow*" "[d]espite a challenging macroeconomic backdrop," "strong industry headwinds," and a "soft industry environment for color cosmetics."  In addition, the release attributed the shocking

Q42021 guidance for a year-over-year decline in net revenues "*to the prior year period's high comparison basis* and softer-than-expected industry-wide color cosmetics sales." [Emphasis added].

137. In a call with securities analysts the same day, the Exchange Act Defendants touted the Company's progress with respect to repositioning the *Perfect Diary* brand. Defendant Huang also commented on the headwinds impacting the color cosmetics industry in China and changes in the Company's business that had caused Yatsen's sales of color cosmetics to decrease by mid-single digits year-over-year in the third quarter, stating:

> [W]e saw a significant deceleration in general consumer and color cosmetic spending in China this quarter. According to the China National Bureau of Statistics, general consumer retail spending and beauty retail spending each recorded year-over-year growth of approximately 5% in the third quarter, with even slower sales growth in Tmall's color cosmetic category.
>
> This industry-wide slowdown extended into the Singles' Day promotion period between November 1 and November 11, 2021, during which color cosmetics sales on Tmall fell by low single digits compared to the prior year. So this industry trend is cyclical in nature, driven by macro economies' uncertainties and the unusual seasonality pattern caused by the COVID-19 pandemic last year.
>
> Our business is likewise undergoing significant changes. *Gross sales from our color cosmetics brands, which make up approximately 84% of total gross sales, decreased by mid-single digits year-over-year in the third quarter. These results were mainly due to our continued alignment of Little Ondine, partially offset by the steady performance of Perfect Diary and Pink Bear*. [Emphasis added].

138. Notwithstanding the macroeconomic headwinds, Defendant Huang sought to reassure investors with respect to the health of Yatsen's business and its business prospects, in particular, the purported strength of its flagship *Perfect Diary* brand stating that:

> Despite these changes, [Yatsen] remain[s] one of the largest publicly-listed pure-play beauty companies in China by revenue size during the third quarter.
>
> *Perfect Diary was once again the largest color cosmetic brand on Tmall channels in terms of sal*es. And Tmall ranked *Pink Bear* as #1 new domestic . . . color cosmetic brand during November Singles' Day event. . . .

46

*We have already seen positive results from our efforts to upgrade and refine the Perfect Diary brand. At the China cosmetic conference . . . Perfect Diary [was named] the most influential brand for the second consecutive year, a strong endorsement of our continued innovation*.

We introduced several effective new products in the third quarter . . . .

We also unveiled a series of new products through IP crossovers and collaboration with well-known brands in other fields . . .

*Furthermore, well-known Chinese celebrities . . . joined with international-acclaimed Chinese actress Zhou Xun to serve as the joint spokesperson for Perfect Diary, further strengthening our brand recognition*. [Emphases added].

139. During the question-and-answer portion of the call, Defendants identified deep discounting by international brands as a particular headwind during Singles' Days events but suggested that the tide was turning and urged investors to be patient. In this regard, Defendant Huang stated:

[I]n the Singles' Day, we saw this year a very aggressive promotion and discount tactics adopted by global brands. And also those global brands . . . booked a lot of the slots with the top KOLs . . ., who dominated the remaining traffic and GMV at Tmall. . . .

[L]ooking forward about what we see about the competition, I think this is not going to be a sustainable tactic by the global brands because it will . . . significantly hurt their premium brand image. So . . . during the past 1 or 2 weeks, we see the global brand sales is kind of like remaining[sic] to normal. . . .

140. The statements identified in ¶¶136-39 above were materially false and misleading because the poor results announced for Q32021 and forecast for Q42021 were not the result of a sudden downturn in China's color cosmetics market but, instead, were a continuation of several quarters of poor performance in Yatsen's two most important brands – *Perfect Diary* and *Little Ondine* – due to fundamental issues with the Company's business and strategy as detailed above. Moreover, Defendant Huang's statement that Q32020 was a tough comparator for Yatsen was materially false and misleading because as detailed above, *Perfect Diary's* sales volume and sales

revenue on Tmall/Taobao had ***declined significantly*** during each month of and for the quarter ended Q32020. Further, *Little Ondine's* year-over-year sales revenue on Tmall/Taobao had completely cratered by Q32021 falling to RMB73.5 million from RMB227.38 million in Q32020, a decline of nearly 68%.

### D. Loss Causation/Economic Loss

141. The Exchange Act Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Lead Plaintiffs and members of the Class. During the Class Period, Lead Plaintiffs and Class members purchased Yatsen ADS at artificially inflated prices caused by the Exchange Act Defendants' misconduct as alleged herein. The price of the Company's common stock declined significantly when the material risks concealed by the Exchange Act Defendants materialized and the Exchange Act Defendants' material misrepresentations and omissions were revealed to the market, causing investors' losses.

142. Before the end of the Class Period on March 10, 2022, investors had been unaware of the following material facts about Yatsen that had been known to the Exchange Act Defendants throughout the Class Period:

(a) Sales of Yatsen's two most important brands, which accounted for over 90% of the Company's net revenues, had stalled and/or were declining;

(b) Yatsen's need to reduce its massive selling and marketing expenses was undermining its ability to continue to drive growth; and

(c) Fewer new products were on tap to be launched after the IPO, further undermining Yatsen's ability to win repeat purchasers and continue to drive growth.

143. The Exchange Act Defendants' misrepresentations and omissions, as alleged in ¶¶102-40 above, misrepresented and concealed the true adverse material facts from the market

48

during the Class Period, leading investors to wrongly believe that Yatsen's most important brands – *Perfect Diary* and *Little Ondine* – were experiencing "strong," "steady," and "healthy" growth when, in fact, they were not.

144. Despite repeatedly (and misleadingly) touting *Perfect Diary* and *Little Ondine's* performance throughout the Class Period, the Exchange Act Defendants slowly began to reveal the truth about Yatsen's flagship brands, and Yatsen's prospects, in the second half of 2021.

145. For example, although the Exchange Act Defendants' statements concerning Yatsen's growth prospects and the performance of the *Perfect Diary* brand in Yasen's earnings release and during the Company's call with securities analysts on August 26, 2021 were, on balance, positive (*see* ¶¶122-31), Yatsen also issued guidance for Q32021 net revenue growth of just 5% to 10%, acknowledged "intensifying competition" and "rising customer acquisition costs," and stated that Yatsen had "move[d] too fast to reallocate [its] talent into the skincare business unit" and "need[ed] to refocus and also to devote more resources to continue the growth trend of [its] main brands." As a result, the price of Yatsen's ADS declined 17.64% on August 26, 2021, to close at $4.81 per ADS.

146. Similarly, on November 17, 2021, a press release was issued detailing Yatsen's third quarter 2021 financial results and Q4 2021 net revenue guidance and the Exchange Act Defendants held a conference call with analysts. Despite touting that Yatsen's topline growth had continued in the face of "a challenging macroeconomic backdrop," "strong industry headwinds," and a "soft industry environment for color cosmetics," the Exchange Act Defendants also disclosed that Yatsen's sales of color cosmetics in the quarter had decreased by mid-single digits "mainly due to [Yatsen's] continued realignment of *Little Ondine* partially offset by the steady performance of *Perfect Diary* . . . ." Moreover, reported Q32021 net income growth was at the low end of the

49

previously announced range of 5% to 10%, and the Company issued guidance for a year-over-year decline of 15% to 20% in Q42021 net revenues. As a result, the price of Yatsen's ADS plummeted, closing on November 17, 2021, at $2.70 per ADS, representing a 17.93% decline from the previous day's close.

147. Then, on March 10, 2022, Yatsen released its fourth quarter and full year financial results for the period ended December 31, 2021, revealing that its disappointing financial results were not solely due to issues with *Little Ondine* but, rather, *Perfect Diary* as well. In commenting on the "challenging quarter," Defendant Huang blamed "soft consumer demand and intense competition in the color cosmetics segment," for the 22.1% decline in total net revenues and 17.2% drop in gross sales for the fourth quarter. In addition, the Exchange Act Defendants issued guidance for a year-over-year ***decline*** in Q12022 net revenues of approximately 35% to 40%.

148. During the Company's earnings call with analysts that same day, Defendant Huang conceded that Yatsen's disappointing results were the result of a deceleration in sales of its leading brands that began in 2020 and ended with the low and negative growth in the second half of 2021, stating in relevant part:

> ***[A]s the color cosmetics market started to decelerate in 2020 and then experienced low growth in the second half of 2021, competition also intensified among our domestic and global players***.
>
> Given such market developments, we evolved our business focus to take a more balanced and holistic approach to sustainable growth. This new phase of our development, ***which began last year*** includes building a diversified brand portfolio covering different price tiers within color cosmetics and skincare category, upgrading our R&D capabilities and promoting iconic durable brands with reduced discounts and promotions. [While] we believe this is the right approach for Yatsen[,] [t]he positive impact from our strategy evolution will take several quarters to take effect. . . .
>
> While we began on a strong note in the first half of 2021, ***we experienced a significant deceleration*** in the second half, particularly during the fourth quarter when total net revenue declined by 22.1% year-over-year. ***Our total net revenue***

*from color cosmetic brands, including Perfect Diary, Little Ondine*, and Pink Bear *declined by 33.9% year-over-year in the fourth quarter*.

[Emphases added].

149. Further, in response to an analyst's question about Yatsen's shocking Q12022 net revenue guidance, Defendant Yang admitted that Yatsen was "dramatically cut[ting] [its] promotions and the connectivity [a]nd as a result of that, [its] short-term sales [would] be affected significantly."

150. On this news, Yatsen's ADS cratered, *falling 39.5%* to close on March 10, 2022, at just over $0.75 per ADS.

151. By the commencement of this action, Yatsen's ADS traded as low as $0.39 per ADS, or over a 96% drop from the $10.50 offering price. All told, investors have lost hundreds of millions of dollars.

**E.      Applicability of the Fraud-on-the-Market Presumption of Reliance**

152. The market for Yatsen's ADS was open, well developed, and efficient at all relevant times. As a result of the Exchange Act Defendants' materially false or misleading statements and material omissions, Yatsen's ADS traded at artificially inflated prices during the Class Period. Lead Plaintiffs and other members of the Class purchased or otherwise acquired Yatsen's ADS relying on the integrity of the market price of such securities and on publicly available market information relating to Yatsen. Lead Plaintiffs and Class members have been damaged thereby.

153. During the Class Period, the artificial inflation of the value of Yatsen ADS was caused by the material misrepresentations and omissions alleged in this Amended Complaint, thereby causing the damages sustained by Lead Plaintiffs and other Class members. As alleged above, during the Class Period, Defendants made, or caused to be made, a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the

51

price of Yatsen's ADS to be artificially inflated at all relevant times. When the truth was disclosed, it drove down the value of Yatsen's ADS, causing Lead Plaintiffs and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

154. At all relevant times, the market for Yatsen ADS was efficient for the following reasons, among others:

(a) Yatsen ADS met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a registered issuer, Yatsen filed periodic public reports with the SEC;

(c) Yatsen regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases and conference calls with securities analysts; and

(d) Yatsen was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, which reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

155. Based on the foregoing, during the Class Period, the market for Yatsen ADS promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of Yatsen ADS. As a result, the market for Yatsen ADS was efficient during the Class Period and, therefore, investors' purchases of Yatsen ADS at artificially inflated market prices give rise to a Class-wide presumption of reliance under the fraud-on-the-market doctrine.

**F.      Causes of Action**

### COUNT I

**For Violations of §10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
(Against the Exchange Act Defendants)**

156.      Lead Plaintiffs repeat and reallege each and every allegation contained in ¶¶1-16, 43-58, and 94-155 above as if fully set forth herein.

157.      This Count is asserted on behalf of all members of the Class against the Exchange Act Defendants – Yatsen, Huang, and Yang – for violations of §10(b) and the Exchange Act, 15 U.S.C. §78(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

158.      The Exchange Act Defendants carried out a plan, scheme, and course of conduct which was intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other Class members, as alleged herein; and (b) caused Lead Plaintiffs and the other members of the Class to purchase Yatsen ADS at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, each of the Exchange Act Defendants took the actions set forth herein.

159.      During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified herein, among others, which they knew, or deliberately disregarded, were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

160.      The Exchange Act Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's ADS in an effort

to maintain artificially high market prices for Yatsen ADS in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

161. The Exchange Act Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and future prospects of Yatsen as specified herein.

162. The Exchange Act Defendants employed devices, schemes, and artifices to defraud while in possession of material, adverse, non-public information, and engaged in acts, practices, and a course of conduct, as alleged herein, in an effort to assure investors of Yatsen's value and performance and continued substantial growth, which included the making of, or participation in the making of, false statements of material facts and omitting to state material facts necessary in order to make the statements made about Yatsen and its business operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Yatsen ADS.

163. As described above, the Exchange Act Defendants acted with scienter throughout the Class Period in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Exchange Act Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's results and growth prospects, thereby artificially inflating the price of its ADS. As demonstrated by the Exchange Act Defendants' omissions and misstatements of the Company's business strategy, the Exchange Act Defendants,

54

if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

164. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Yatsen's ADS was artificially inflated. In ignorance of the fact that market prices of Yatsen's ADS were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Exchange Act Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to, or recklessly disregarded, by the Exchange Act Defendants, but not disclosed in public statements by the Exchange Act Defendants, Lead Plaintiffs and the other members of the Class acquired Yatsen ADS at artificially high prices and were, or will be, damaged thereby.

165. At the time of said misrepresentations and omissions, Lead Plaintiffs and the other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiffs, the other members of the Class, and the marketplace known the truth regarding the Company's business, which was not disclosed by the Exchange Act Defendants, Lead Plaintiffs and the other members of the Class would not have purchased, or otherwise acquired, their Yatsen securities, or if they had acquired such securities, they would not have done so at the artificially inflated prices that they paid.

166. By virtue of the foregoing, the Exchange Act Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

167.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's ADS.

168.    This action was filed within two years of discovery of the fraud and within five years of each Lead Plaintiff's purchase of Yatsen ADS giving rise to the cause of action.

## COUNT II
### For Violations of §20(a) of the Exchange Act
### (Against Defendants Huang and Yang)

169.    Lead Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-16, 43-58, and 94-168 above as if fully set forth herein.

170.    Defendants Huang and Yang acted as controlling persons of Yatsen within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a), as alleged herein.  By virtue of their high-level positions, agency, ownership, contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial and related statements filed by the Company with the SEC and disseminated to the investing public, these Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading.  These Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to have been misleading prior to, and/or shortly after, these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

171.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to

56

control or influence the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.

172. As set forth above, the Exchange Act Defendants each violated §10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions, as alleged in this Complaint.

173. By virtue of their positions as controlling persons, Defendants Huang and Yang are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's ADS.

174. This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiffs' purchase of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, on their own behalf and on behalf of the Class prays for relief and judgment as follows:

A. Declaring that this action is a proper class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as Class representatives and designating Lead Counsel as Class Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of their wrongdoing, in an amount to be proved at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

D. Awarding rescission or a rescissionary measure of damages; and

E. Awarding such other and further relief as the Court deems appropriate.

57

## JURY DEMAND

Lead Plaintiffs demand trial by jury.

Dated: October 4, 2023       **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

  */s/ Deborah Clark-Weintraub*
Deborah Clark-Weintraub
Thomas L. Laughlin, IV
Jonathan M. Zimmerman (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone:  (212) 223-6444
Facsimile:   (212) 223-6334
dweintraub@scott-scott.com
tlaughlin@scott-scott.com
jzimmerman@scott-scott.com

*Attorneys for Lead Plaintiffs and Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile:  310-388-0192
brian@schallfirm.com

*Additional Counsel for Lead Plaintiffs*

58

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

_s/ Deborah Clark-Weintraub_
Deborah Clark-Weintraub