**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE YATSEN HOLDING LIMITED SECURITIES LITIGATION** | Case No. 22 CIV. 8165 (DEH) (BCM) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION .............................................................................................................................1

RELEVANT FACTS .......................................................................................................................3

      A.    Yatsen's IPO and Business ...................................................................................3

      B.    The Undisclosed Material Adverse Trends and Conditions Impacting
           Yatsen's Business as of the IPO ..........................................................................4

      C.    Materially Untrue Statements and Omissions in the IPO Offering
           Documents ..........................................................................................................5

      D.    Post-IPO Misstatements and the Gradual Revelation of the Truth.........................7

ARGUMENT..................................................................................................................................10

I.      LEGAL STANDARD.........................................................................................................10

II.    PLAINTIFFS PLEAD MATERIAL MISSTATEMENTS AND OMISSIONS ...............12

      A.    Sales of Yatsen's Core Brands Had Stalled and Were Declining.........................12

      B.    Defendants Had a Duty to Disclose the Omitted Facts Concerning Sales of
           *Perfect Diary* and *Little Ondine*.....................................................................14

      C.    Defendants Had a Duty to Disclose the Omitted Facts Concerning
           Yatsen's Selling Expenses ..................................................................................16

      D.    Defendants Had a Duty to Disclose the Omitted Facts Concerning
           Yatsen's New Product Launches .........................................................................17

III.   PLAINTIFFS' '33 ACT CLAIMS ARE NOT TIME-BARRED ......................................18

IV.   PLAINTIFFS HAVE ADEQUATELY PLED SCIENTER ............................................19

V.    PLAINTIFFS HAVE ADEQUATELY PLED LOSS CAUSATION AND
      DEFENDANTS HAVE NOT PROVEN NEGATIVE CAUSATION..............................22

CONCLUSION...............................................................................................................................25

## TABLE OF AUTHORITIES

**PAGE(S)**

CASES

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)..................................................................................................24

*Bd. of Trs. of Ft. Lauderdale v. Mechel OAO*,
811 F. Supp. 2d 853 (S.D.N.Y. 2011).....................................................................................21

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)..................................................................................................22

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018)....................................................................................................19

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013).....................................................................................24

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012).....................................................................................20

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
138 S. Ct. 1061 (2018)..........................................................................................................10

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..............................................................................................................22

*FHFA v. Nomura Holding Am., Inc.*,
873 F.3d 85 (2d Cir. 2017)....................................................................................................18

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017).....................................................................................11

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010).....................................................................................22

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)..................................................................................................13

*In re Dentsply Sirona, Inc. Sec. Litig.*,
665 F. Supp. 3d 255 (E.D.N.Y. 2023) ...............................................................................16, 19

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
251 F. Supp. 3d 596 (S.D.N.Y. 2017).....................................................................................20

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)..................................................................................................14

*In re Pareteum Sec. Litig.*,
  2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ............................................................10, 19, 22

*In re Vale S.A. Sec. Litig.*,
  2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) .......................................................................22

*Knipe v. Skinner*,
  999 F.2d 708 (2d Cir. 1993).................................................................................................17

*Levine v. AtriCure, Inc.*,
  508 F. Supp. 2d 268 (S.D.N.Y. 2007)..............................................................................22, 23

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011).............................................................................................11, 13

*Luce v. Edlstein*,
  802 F.2d 49 (2d Cir. 1986)...................................................................................................25

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013).................................................................................................11

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)...................................................................................................2

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012).................................................................................................15

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
  2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)........................................................................16

*San Landro Emergency Med. Grp. Profit Sharing Plan v. Phillip Morris Cos.*,
  75 F.3d 801 (2d Cir. 1996)...................................................................................................17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)........................................................................................................19, 20

*Van Dongen v. CNisure Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013)...................................................................................13

*Wang v. Cloopen Grp. Holding Ltd.*,
  661 F. Supp. 3d 208 (S.D.N.Y. 2023)............................................................................ *passim*

*Winter v. Stronghold Digital Mining, Inc.*,
  2023 WL 5152177 (S.D.N.Y. Aug. 10, 2023).......................................................................22

*Xiang v. Inovalon Holdings, Inc.*,
  254 F. Supp. 3d 635 (S.D.N.Y. 2017)...................................................................................19

**STATUTES AND RULES**

Federal Rules of Civil Procedure
    Rule 8(a)..................................................................................................................11, 22
    Rule 9(b) ......................................................................................................................11
    Rule 15(a)....................................................................................................................25

15 U.S.C.
    §78u-4(b)(2)(A) ...........................................................................................................19

## INTRODUCTION

This is a securities class action on behalf of all purchasers of Yatsen Holding Limited ("Yatsen" or the "Company") American Depositary Shares ("ADS") between the Company's initial public offering ("IPO") on November 19, 2020, and March 10, 2022, inclusive (the "Class Period"). Plaintiffs assert strict liability claims against Yatsen, the Company's Chairman and Chief Executive Office ("CEO"), Jinfeng Huang ("Huang"), and its Chief Financial Officer ("CFO") Gonghao Yang ("Yang"), as well as certain other executives and Company board members, the IPO underwriters and other control persons pursuant to §§11 and 15 of the Securities Act of 1933 (the "'33 Act"). *See* ¶¶18-42.[1] Plaintiffs also separately assert securities fraud claims against Yatsen, CEO Huang, and CFO Yang pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "'34 Act"), as well as Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.[2] *See* ¶¶95-98.

To attract investors to its IPO and prop up its stock price following the IPO, Yatsen peddled a growth story that, unbeknownst to investors, was old news. Page after page of the Offering Documents (as defined below) lauded (i) the Company's rapid revenue growth; (ii) its "disruptive," digital direct-to-consumer ("DTC") business model, which Defendants claimed allowed Yatsen to rapidly launch and scale multiple brands; (iii) the popularity and growth of its flagship color cosmetics brands, *Perfect Diary* and *Little Ondine*, which accounted for approximately 95% of Yatsen's revenue; and (iv) its enormous market opportunity.

By the time of the IPO, however, revenue and sales for *Perfect Diary* and *Little Ondine* on Tmall, the platform on which most of Yatsen's products were sold, were declining due to a

---

[1] All "¶_" cites are to the Amended Class Action Complaint for Violations of the Federal Securities laws, ECF No. 62 (Oct. 4, 2023) (the "AC").

[2] For convenience, Defendants Yatsen, Huang, and Yang are collectively referred to as the "'34 Act Defendants."

combination of market saturation, increased competition, unsustainable selling and marketing expenditures ("Selling Expenses") and inadequate research and development ("R&D"), causing Yatsen's sales growth to stall and decline.  Rather than disclose this information, Defendants continued to tout Yatsen's financial results, the effectiveness of its DTC model, and the purportedly "strong" sales of its flagship products thereby misleading investors.

Defendants' arguments that Plaintiffs have failed to plead any material misrepresentations are contrary to well-settled law.  Here, Defendants' statements left investors with the misleading impression of (i) a proven DTC business model that would "continue to enable [Yatsen] to efficiently and rapidly build and scale successful[] brands and products," (ii) market-leading and growing brands, and (iii) rebounding growth from the negative impact of COVID-19 when, in fact, the opposite was true.  Accordingly, they had a duty to disclose the omitted facts concerning declining sales of their core brands, unsustainable Selling Expenses and slowing and delayed new product launches.  *See Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 228 (S.D.N.Y. 2023).

Defendants' scienter and loss causation arguments are equally unpersuasive.  Scienter is adequately alleged when, as here, Plaintiffs have alleged that Defendants "knew facts or had access to information suggesting that their public statements were not accurate."  *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).  Loss causation is also adequately alleged consistent with Fed. R. Civ. P. 8.  Plaintiffs allege that the truth was revealed to investors through a series of announcements disclosing, *inter alia*, declining color cosmetics sales, intensifying competition, rising customer acquisition costs, and the need to devote more resources to continue the growth trend of Yatsen's main brands.  Following these revelations, Yatsen's stock price declined from the IPO price of $10.50 to as low as $0.30 by the commencement of this action and has never recovered.  Nothing more is required to plead loss causation.  Defendants' fact-based arguments

positing potential alternate causes for these declines are improper at the pleading stage. And the fact that the truth trickled out over time did not trigger any statute of limitations. For all of these reasons, and those reasons stated herein, Defendants' motion to dismiss should be denied.

## RELEVANT FACTS

### A.    Yatsen's IPO and Business

Yatsen is a China-based company that manufactures and sells color cosmetics and skincare products, typically directly to consumers. ¶2. On November 19, 2020, pursuant to a Form F-1 Registration Statement and incorporated Prospectuses (the "Offering Documents"), Yatsen sold 59 million ADS to investors at $10.50 per share in its IPO, which raised $616.9 million. *Id.*

At the time of the IPO, Yatsen had two main brands, the color cosmetics lines *Perfect Diary* and *Little Ondine*. ¶3. *Perfect Diary*, Yatsen's flagship, mass-market brand accounted for 100%, 98.3%, and 82.1% of Yatsen's sales in 2018, 2019, and for the nine months ended September 30, 2020 (two months before the IPO), respectively. ¶45. Consistent with these pre-IPO trends, over 95% of Yatsen's 2020 revenues came from *Perfect Diary* and *Little Ondine* cosmetics. ¶3.

Due to the success of *Perfect Diary* and, to a lesser extent, *Little Ondine*, Yatsen experienced significant pre-IPO growth—going from a company founded in 2016 to one with net revenues of ¥635.3 million in 2018 and ¥3.0 billion in 2019. ¶45. The Company attributed its rapid growth to its DTC business model, which focused on selling products directly to customers online and, to a lesser extent starting in 2019, in "experience stores." ¶46. Yatsen's primary DTC sales channel was Alibaba's Tmall, the largest business-to-consumer e-commerce platform in China, akin to Amazon in the United States. ¶¶4, 46. Thus, sales on Tmall were singularly important to Yatsen's bottom line and future growth.

According to the Offering Documents, the DTC model gave Yatsen insights into consumer preferences and behavior that allowed it to rapidly develop new products and more efficiently price

3

its products.  ¶47.  These insights and efficiencies, according to the Offering Documents, allowed Yatsen to develop new and more popular products faster than competitors, resulting in a "a large and loyal customer base" with "strong and improving repeat purchase rates."  ¶47.  By the time of the IPO, 86% of Yatsen's net revenues were generated through DTC channels.  ¶48.

The downside to Yatsen's DTC strategy was its considerable cost, especially in the competitive digital marketing landscape in China.  ¶49.  For example, the Company advertised extensively on (and to a lesser extent sold directly on) Chinese social media platforms that engage customers directly using a network of close to 15,000 Key Opinion Leaders (*i.e.*, influencers) and celebrity partners.  ¶46.  All of this marketing, which was integral to Yatsen's DTC model and had fueled its pre-IPO growth, was extraordinarily expensive and ultimately unsustainable.

### B.    The Undisclosed Material Adverse Trends and Conditions Impacting Yatsen's Business as of the IPO

Throughout 2020, sales from *Perfect Diary* and *Little Ondine* declined on the all-important Tmall platform.  ¶¶50-52, 54.  Units of *Perfect Diary* products sold on Tmall and Taobao (another online marketplace owned by Alibaba) declined from 4.2 million in January 2020 to 1.6 million in October 2020 (the month before the IPO).  ¶50.  Unsurprisingly, in 3Q2020, the last completed quarter before the IPO, *Perfect Diary's* sales revenues from Tmall/Taobao declined 26% as compared to the corresponding period in 2019.  ¶67.  Following the IPO, *Perfect Diary's* sales on, and revenues from, Tmall/Taobao continued generally declining through December 2021, with the exception of a few, isolated upticks due to popular Chinese shopping holidays.  ¶¶52, 54.  At the same time *Perfect Diary's* sales were falling, monthly sales revenues on Tmall/Taobao for Yatsen's second-most important brand, *Little Ondine*, were also declining sharply.  ¶¶53-54.  Consequently, by the time of the IPO (and for over a year after) sales from Yatsen's two key brands on its most important DTC sales channel (Tmall/Taobao) were declining, which would have devastating consequences—specifically, slowing topline growth and a stunning net loss of ¥2.68

4

billion in 2020, after having posted positive net income of ¥75 million in 2019, and stagnating or declining revenues for 2021.  ¶¶58, 145-48.

The decline in sales of *Perfect Diary* and *Little Ondine* on Tmall/Taobao did not occur in a vacuum.  Rather, as alleged, there were several known (or at least knowable) causes.  *See* ¶55-57.  *First*, by the time of the IPO, *Perfect Diary* had fully saturated its market.  ¶55.  *Second*, starting in 2020, Yatsen faced increased competition from both domestic and well-known overseas brands that had co-opted Yatsen's DTC sales strategy.  ¶56.  In response, Yatsen was forced to significantly increase its already high Selling Expenses to continue to drive growth.  ¶56.  For example, as a percentage of Yatsen's revenue, such expenses were 48.7% in 2018 and 41.3% in 2019, but for the nine months ending September 30, 2020, they had ballooned to 62.2% of net revenue and would increase to an astounding 72% by 1Q2021.  ¶56.  Thus, at the same time Yatsen was *selling less* of its *Perfect Diary* and *Little Ondine* products it was *paying much more* to sell those products.  ¶56.  *Third*, Yatsen had undermined its future growth by failing to invest sufficiently in R&D, which was needed to rapidly develop new products that would promote customer loyalty and attract new customers.  ¶57.  As a result, the pace at which Yatsen launched new product SKUs slowed markedly before the IPO.  ¶57.  By November 2020 (the month of the IPO) data from the Chinese government reflects that *Perfect Diary* registered its lowest number of new product SKUs since the first quarter of 2019, setting the stage for continued slowing of and decline in growth following the IPO.  ¶57.

C.    **Materially Untrue Statements and Omissions in the IPO Offering Documents**

Yatsen's pitch for the IPO was simple:  It was purportedly "a leader in the rapidly growing China beauty market" as evidenced by its "fast-growing, successful color cosmetics and skincare brands" *Perfect Diary* and *Little Ondine* that were ranked as "No. 1" or "second most favorite" brands across numerous consumer categories.  *E.g.*, ¶¶4, 59, 62.  In support of this claim, the

5

Offering Documents touted Yatsen's "substantial growth," which it attributed primarily to the Company's DTC business model, which the Offering Documents claimed enabled Yatsen "to efficiently and rapidly build and scale successful brands and products." ¶62. The Offering Documents also emphasized the Company's "large and loyal customer base," which purportedly led to "strong and improving repeat purchase rates," which had "continu[ed] to improve" as Yatsen "strength[ened] and [grew] [its] brand and product portfolio." ¶63. And, as evidence of Yatsen's purportedly "proven ability to launch and grow successful brands more rapidly than [its] peers," the Offering Documents touted the rapid growth in sales from *Perfect Diary* and *Little Ondine* "on Tmall" since their launch. ¶62. The Offering Documents also called out *Perfect Diary's* and *Little Ondine's* "particularly high sales volumes during Tmall's 2020 Singles' Day event" (which had occurred a few days before the IPO) as further evidence of Yatsen's rebound from the negative impact of COVID-19 in China and growth prospects. ¶64.

In sum, the Offering Documents repeatedly touted sales of *Perfect Diary* and *Little Ondine*, particularly on Tmall, as evidence of the Company's success and future prospects. Such statements were untrue and misleading because by the time of the IPO (as explained above, *see supra* pp. 4-5) *Perfect Diary* and *Little Ondine* were not "fast-growing." ¶66. Instead, sales volumes and revenues for both brands through Tmall/Taobao had declined in the months before the IPO and were, at best, flat year-over-year in November 2020, during the all-important Singles' Day event. ¶66. At the same time, Yatsen was paying more in Selling Expenses to sell less of its flagship brands while underinvestment in R&D had negatively impacted Yatsen's ability to rapidly launch new products, a key driver of its earlier growth. ¶68. None of these adverse trends and circumstances, which continued and accelerated after the IPO, were disclosed to investors.

In fact, the opposite occurred. While acknowledging that Yatsen's total net revenues had "experienced slower-than-expected growth in the nine months ended September 30, 2020,"

6

Defendants blamed COVID-19 and reassured investors that as "overall consumer sentiment and purchasing activities gradually resumed [in 3Q2020], the growth in [Yatsen's] total net revenues for [3Q2020] rebounded" and was higher in 3Q2020 as compared to "the corresponding quarter in 2019." ¶65. Likewise, the Offering Documents falsely blamed the precipitous increase in Selling Expenses in 3Q2020 on "stepped up [] marketing efforts" needed to "capture" demand "as the impact of COVID-19 in China gradually declined in the third quarter of 2020," rather than increased competition. Ex. B at 36.[3]

### D.    Post-IPO Misstatements and the Gradual Revelation of the Truth

The negative growth trend that was evident before the IPO, but not disclosed, only accelerated thereafter. Nevertheless, Defendants kept touting Yatsen's growth and DTC model. For example, during the Company's 4Q2020 earnings call on March 11, 2021, Defendants touted the "strong performance across [Yatsen's] brand portfolio," "the deep market appeal of its products," "the success of [the Company's] growth strategy," its "ability to quickly grow [its] business as evidenced by the accelerated expansion of" *Perfect Diary* "and the rapid growth witnessed by" *Little Ondine*, "the effectiveness of [Yatsen's] disruptive B2C business model," the Company's ability "to consistently deliver innovative products" and its "strong R&D capabilities," all of which Defendants claimed "uniquely" gave Yatsen "a leading role in" "China's fast-growing beauty industry." ¶¶106-07. These statements and others like them were materially false and misleading because far from being "strong," "accelerating," or "growing," sales of *Perfect Diary* on Tmall/Taobao were essentially flat year-over-year in 4Q2020. ¶111. Worse, sales revenues from *Little Ondine* on Tmall/Taobao had continued to decline precipitously in 4Q2020—falling from ¥80.6 million in September down to ¥62.9 million in October, and down to ¥52.8 million in

---

[3]    All citations to "Ex. __" are to the exhibits attached to the Declaration of Robert A. Fumerton in Support of the MTD, ECF No. 68 (Dec. 4, 2023), and the pin cites are to the original pagination of the documents.

December.  ¶111.  Furthermore, Yatsen's DTC model was not "effective" given its cost structure, and its R&D capabilities were neither "strong" nor "consistently deliver[ing] innovative products."

Despite the downward trends in *Perfect Diary* and *Little Ondine*, during the March 2021 investor call, CFO Yang falsely stated he "believe[d] that the growth rate of [Yatsen's] overall business [would] start to come back or pick up starting from Q2 compared to Q1" such that the "Q1 growth rate year-over-year is [not] representative of the growth rate for the full year."  ¶110. This too was misleading as the '34 Act Defendants knew or recklessly disregarded that the R&D investments needed to catalyze increased growth were not in place, and that Yatsen faced increased competition, but Selling Expenses were unsustainable and would have to be reduced.  ¶112.

Defendants made similar misleading statements on May 19, 2021, in announcing Yatsen's 1Q2021 financial results.  ¶113.  In a press release and on a call with investors, the '34 Act Defendants trumpeted Yatsen's "robust topline growth," which they attributed to the "stellar performance" of the "*Perfect Diary* brand as well as robust growth from *Little Ondine*," and touted Yatsen's purported "stellar operating performance," which they claimed "position[ed] [Yatsen] well to . . . capture the growth potential of China's beauty market."  ¶¶114-15.  In stark contrast to "stellar" performance and "robust" growth, *Perfect Diary's* month-over-month performance on Tmall/Taobao declined significantly in 1Q2021.  ¶119.  Specifically, sales volumes declined 21% in January, 28% in February, and 5% in March, and revenues declined nearly 32% in January, 1% in February, and 10% in March.  ¶119.  Things were worse for *Little Ondine*, with Tmall/Taobao sales revenues declining to levels on par with those seen during pandemic lockdowns.  ¶120.

Nevertheless, on August 26, 2021, in connection with the release of Yatsen's 2Q2021 financial results and guidance for 3Q2021, the '34 Act Defendants once again touted sales of *Perfect Diary* and *Little Ondine* and future growth prospects.  ¶¶123-31.  The '34 Act Defendants characterized 2Q2021 as "another quarter of strong growth" with a "steady contribution" from the

8

"*Perfect Diary* brand" whose "solid results came despite intensifying competition and rising customer acquisition costs." ¶¶123-25. Moreover, CEO Huang tried to allay investor concerns with the Company's disappointing 3Q2021 revenue guidance by claiming it was "largely due to the unusual seasonality pattern caused by the COVID-19 pandemic." ¶127. And, when asked if the revenue guidance for 3Q2021 signaled that *Perfect Diary* "could be declining in third quarter," CFO Yang said, "we still see a very healthy growth trend of *Perfect Diary* main brand." ¶130.

Once again, the '34 Act Defendants' statements were at odds with the actual sales of *Perfect Diary* and *Little Ondine*. Sales volumes and revenues on Tmall/Taobao for *Perfect Diary* were both down quarter-over-quarter, with volumes in 2Q2021 declining about 6.4% as compared to 1Q2021, and sales revenues declining 7.5% as compared to 1Q2021 to a level approximately 4% less than they were pre-pandemic in 2Q2019. ¶132. *Little Ondine's* Tmall/Taobao sales revenues declined year-over-year 25% in April, 52% in May, and 43% in June, for an overall 2Q2021 decline of 42% as compared to 2Q2020. ¶133. Thus, there was simply no reasonable basis for the '34 Act Defendants to claim that lower revenue growth was the product of "unusual seasonality" and would quickly return to normal especially in light of the massive cut in Selling Expenses during the quarter. ¶126.

Finally, on November 17, 2021, Yatsen released disappointing 3Q2021 results and guidance for 4Q2021. In a press release, the '34 Act Defendants touted that Yatsen's "topline continued to grow," and blamed projected revenue declines on "a challenging macroeconomic backdrop," "strong industry headwinds," and a "soft industry environment for color cosmetics." ¶136. These statements were materially false and misleading because the poor results announced for 3Q2021 and forecast for 4Q2021, were not the result of a sudden, unexpected decline in China's cosmetics market but rather were a continuation of multiple quarters of poor performance by

9

Yatsen's two key brands.  ¶140.  By this time *Little Ondine's* year-over-year sales revenue on Tmall/Taobao had fallen off a cliff, declining nearly 68% in 3Q2021 as compared to 3Q2020.  *Id*.

On March 10, 2022, Yatsen finally came clean when it released its 4Q2021 and full year 2021 financial results, which revealed a 22.1% decline in 4Q2021 total net revenue and 17.2% drop in gross sales.  During an earnings call that same day, CEO Huang conceded the disappointing 4Q2021 results (and projected further revenue declines in 1Q2022) were due to a "color cosmetics market [that] started to decelerate in 2020" all while "competition also intensified among our domestic and global players."  ¶148.  Huang further admitted that Yatsen's attempts to mitigate these trends "began last year."  *Id*.  Huang then acknowledged that Yatsen's "total net revenue from color cosmetic brands, including *Perfect Diary*, *Little Ondine*" and others "declined by 33.9% year-over year in the fourth quarter."  *Id*.  As a result, Yatsen was "dramatically" cutting Selling Expenses and "short-term sales [would] be affected significantly."  ¶149.

Yatsen's stock declined steadily as news of its problems trickled out.  *See* ¶¶145-48.

**ARGUMENT**

## I.    LEGAL STANDARD

Plaintiffs here bring both strict liability claims under §§11 and 15 of the '33 Act and fraud claims under §§10(b) and 20(a) of the '34 Act, and Rule 10b-5 promulgated thereunder.  These claims have markedly different elements and pleading standards.

As relevant here, to state a claim under §11 of the '33 Act, which was enacted to provide "full and fair disclosure" in connection with securities offerings, *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1066 (2018), Plaintiffs need only allege the purchase of a registered security pursuant to a registration statement that "contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  *E.g.*, *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *18 (S.D.N.Y.

10

Aug. 11, 2021). Once that is done, "the general rule [is] that an issuer's liability . . . is absolute." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011). Scienter, reliance and causation need not be alleged. *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013). Thus, these claims are subject to Rule 8(a)'s pleading standard, which simply requires a "short and plain statement" of the claim showing that the pleader is entitled to relief. *Litwin*, 634 F.3d at 715.[4] The '33 Act claims meet this standard.

Plaintiffs' claims under the '34 Act require pleading "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Parateum*, 2021 WL 3540779, at *12. Defendants do not contest that elements three, four, and have five have been adequately alleged. *See* Defs.' Mem. Law in Supp. of Mot. to Dismiss, ECF No. 66 (Dec. 6, 2023) ("MTD"), at 13-25.

The '34 Act claims are subject to the pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Rule 9(b) requires that "the circumstances constituting fraud . . . be stated with particularity." *Id.* at *12. The PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading" and a "strong inference" of scienter. *Id.* However, in applying these standards, courts must still "accept as true all well-pleaded factual allegations in the complaint[]

---

[4]    Defendants contend the '33 Act claims are subject to Fed. R. Civ. P. 9(b) because the '34 Act claims have some overlapping factual allegations and so all the claims "sound in fraud." MTD at 13. This is not the law. Where (as here) a complaint clearly separates negligence-based claims from fraud claims, Rule 9(b) only applies to the fraud claims. *See, e.g.*, *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 558 (S.D.N.Y. 2017) (applying Rule 8 to '33 Act claims where the complaint "is segregated into two parts," and "'disclaims any allegations of fraud, *scienter*, or recklessness'"). But even if Rule 9(b) applies, it is satisfied here as shown below.

and draw reasonable inferences in the plaintiff's favor." *Id*. at *11.  The '34 Act claims meet these standards.

## II.    PLAINTIFFS PLEAD MATERIAL MISSTATEMENTS AND OMISSIONS

### A.    Sales of Yatsen's Core Brands Had Stalled and Were Declining

Defendants argue Plaintiffs have failed to plead a misstatement because there are no "facts supporting their main premise that sales of *Perfect Diary* and *Little Ondine* were declining or stalling during the relevant periods."  MTD at 15.  In support, Defendants cite to year-over-year increases in net revenues from *Perfect Diary*, on the one hand, and all other brands, including *Little Ondine*, for the nine months ended September 30, 2020, on the other.  However, it is indisputable that *Perfect Diary's* growth during this period was substantially below historic rates (Ex. B at 114) and Defendants admitted that growth during this period was "slower than expected."  ¶65; *see supra* pp. 4-5.

Recognizing this, Defendants wrongly urge the Court to disregard the Tmall/Taobao data in the AC demonstrating declining sales of *Perfect Diary* and *Little Ondine* as "unsourced" and "incomplete."  Defendants offer no justification for their assertion that data explicitly described in the AC as reflecting sales revenue and volume for Yatsen's flagship brands on Tmall and Taobao is "unsourced."   Further, even if there was a requirement to plead facts "corroborating" the Tmall/Taobao data, as Defendants claim, Plaintiffs have done so.  The AC also cites to a January 25, 2022, research report from Sandalwood Advisors that analyzed data from numerous online platforms in addition to Tmall, including ***Douyin and Kuaishu***, the platforms cited by Defendants as purportedly growing channels for sales of Yatsen's brands, and confirms the overall downward trend with respect to global online sales of Yatsen's two largest brands during the relevant period. ¶54.  The Tmall/Taobao data is further corroborated by CEO Huang's admissions that China's "color cosmetics market started to decelerate in 2020" and that during the period June 2020

12

through June 2021 "the whole cosmetic industry growth was mainly driven by skincare and also premium brands," not mass-market brands like *Perfect Diary*. ¶¶131, 148.

Defendants' contention that the Tmall/Taobao data should be ignored as "incomplete" fares no better. According to the Offering Documents, at the time of the IPO, Yatsen's "products [were] sold mainly through Tmall."[5] Ex. B at 172; *see also id.* at 36 ("In both 2019 and the nine months ended September 30, 2020, a majority of [Yatsen's] gross sales were generated through [its] store on Tmall."). Thus, the declines in sales of *Perfect Diary* and *Little Ondine* on this platform were strongly indicative of the brands' performance. Defendants' claim that "Tmall and Taobao accounted for a decreasing percentage of sales after the IPO" (MTD at 16) is an improper fact-based argument that turns on one statement by CEO Huang during an earnings call on November 17, 2021, which cannot be accepted for its truth. *See, e.g.*, *Van Dongen v. CNisure Inc.*, 951 F. Supp. 2d 457, 466 (S.D.N.Y. 2013) ("Defendants' arguments regarding the truthfulness of [certain] statements . . . amount to fact-based disputes that the Court will not credit on a motion to dismiss."). Moreover, the Offering Documents and Yatsen's later SEC filings are replete with statistics touting the performance of its brands, including *Perfect Diary* and *Little Ondine*, on Tmall indicating its enduring importance. *See*, *e.g.*, Ex. B at 2-4, 137-38, 161-72; Ex. P at 54-56 (touting performance of *Perfect Diary* and *Little Ondine* brands on Tmall during 2020 Singles' Day holiday). In contrast, Douyin and Kuaishou are barely mentioned and no specifics are provided concerning the share of Yatsen's sales that occur on these platforms. Defendants' other fact-based argument—that declining sales volume of *Perfect Diary* was simply reflective of

---

[5]    Defendants' concession that Tmall was the main source of Yatsen's sales belies their claim that the performance of *Perfect Diary* and *Little Ondine* on Tmall is immaterial. "Materiality is an inherently fact-specific finding." *Litwin*, 634 F.3d at 716. Here, the alleged omissions concerning the growth trajectory of *Perfect Diary* and *Little Ondine* on Tmall are not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

Yatsen's "premiumization" strategy for the brand launched in 2Q2021—is also improper and ultimately unavailing as it ignores (i) that *Perfect Diary's* net revenues were declining as well (*e.g.*, ¶¶67, 119, 132); and (ii) CEO Huang's admission of a "decelerat[ing]" color cosmetics market starting in 2020.  ¶131, 148.

### B.    Defendants Had a Duty to Disclose the Omitted Facts Concerning Sales of *Perfect Diary* and *Little Ondine*

When a company "makes a disclosure about a particular topic, whether voluntary or required, the representation must be 'complete and accurate.'"  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010).  A duty to disclose is triggered when, upon "examination of 'defendants' representations, taken together and in context,'" the affirmative statements that were made were misleading.  *Id.*[6]

Here, when the Offering Documents and the AC's allegations are read as a whole, as they must be, Plaintiffs have plausibly alleged material misstatements and omissions that rendered the Offering Documents and the '34 Act Defendants' post-IPO statements materially false and misleading.  In the absence of any disclosure that sales of Yatsen's flagship brands had hit a wall and were declining, the Offering Documents and Defendants' post-IPO statements "could reasonably be read as conveying a legitimate expectation of" continued successful execution of the Company's DTC strategy and growth.  *See Cloopen*, 661 F. Supp. 3d at 227-28.  As in *Cloopen*,

---

[6]    Defendants' characterization of certain of their misstatements as inactionable "expressions of puffery and corporate optimism" or opinions that were not rendered misleading by the omitted facts (MTD at 18) is unavailing.  As in *Cloopen*, "[t]he allegedly misleading statements of opinion here," including Yatsen's guidance, "are statements that convey positive beliefs and expectations about the strength of" Yatsen's DTC strategy and growth, and "the Complaint plausibly alleges that such statements conflict with" the omitted facts concerning the performance of *Perfect Diary* and *Little Ondine*.  661 F. Supp. 3d at 229.  Further, the misstatements "are not the sort of enthusiastic or vague 'generalizations regarding business practices' that amount to puffery; instead, the statements are 'fact-based expressions of opinion' which" are plausibly misleading for the same reason.  *Id.* (statements about "***significant*** cross-selling and up-selling potential" and "***strength and loyalty*** of [] existing customer base and associated business opportunities" were actionable).

14

the Offering Documents here made various representations with respect to the Company's

"strategy, its loyal customer base, its steady revenues from existing customers, and its expected

opportunities to increase sales among those customers" that "would have left investors with [the

false and misleading] impression of strong and stable results" (*id*.) when, in fact, by the time of

the IPO, sales of Yatsen's flagship, *Perfect Diary* brand, and its second purported growth engine,

*Little Ondine*, had stalled and were generally trending down, a trend that continued and accelerated

after the IPO.[7]

In addition, Defendants had a duty under Item 303 to disclose the omitted information

concerning the stalling and declining sales of *Perfect Diary* and *Little Ondine*.  Item 303 requires

that registrants disclose "any known trends or uncertainties that have had or that are reasonably

likely to have a material favorable or unfavorable impact on net sales or revenues or income from

continuing operations."  This Item "imposes a disclosure duty where a trend . . . or uncertainty is

both [1] presently known to management and [2] reasonably likely to have material effects on the

registrant's financial condition or results of operations."  *Panther Partners Inc. v. Ikanos

Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012).  Defendants' argument that Plaintiffs fail to

plead facts showing that the Tmall/Taobao data in the AC "was known (or even available) to

management" or was "'reasonably likely' to materially impact Yatsen's financial condition"

(MTD at 17) is unpersuasive.  Demonstrating that Tmall data was readily available to Defendants,

the Offering Documents include statistics regarding the performance of the Company's brands on

---

[7]   The statement in the Offering Documents that sales growth for the nine months ended September 30, 2020 had been "slower-than-expected" (MTD at 14) does not change this conclusion.  This statement was itself false and misleading because it falsely blamed "the impact of COVID-19" for the slower growth rather than increased competition and falsely asserted that "[a]s the negative impact of COVID-19 in China gradually declined in [3Q2020]," "the growth in [Yatsen's] total net revenues for [3Q2020] rebounded" and was higher in 3Q2020 compared to "the corresponding quarter in 2019."  ¶65.  In fact, in 3Q2020, *Perfect Diary* sales revenue and volume on Tmall/Taobao fell each month and for the quarter overall compared to 2019, while *Little Ondine's* sales revenue fell sharply in August and September 2020.  ¶¶53, 67.

Tmall during Tmall's 2020 Singles' Day Event from November 1, 2020 to November 11, 2020, *just a week before the IPO*.  ¶64.  Moreover, as described above, the AC plausibly alleges that the downward trajectory in Yatsen's flagship brands reflected in the Tmall/Taobao data was reasonably likely to have a material impact on Yatsen's financial condition given Defendants' admission that Yatsen's store on Tmall was "*the main source of the Company's sales*."  *See In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 289 (E.D.N.Y. 2023) (Item 303 known trend or uncertainty that was reasonably likely to have material effects adequately alleged when market was trending down and defendants were aware relationship with key customer was uncertain).

## C.    Defendants Had a Duty to Disclose the Omitted Facts Concerning Yatsen's Selling Expenses

As alleged, by the time of the IPO, Yatsen's Selling Expenses had reached an unsustainable level as increased competition forced the Company to spend more to drive growth.  ¶56.  Rather than acknowledging the actual reason for the precipitous rise in Selling Expenses as a percentage of total net revenues, the Offering Documents and Yatsen's post-IPO SEC filings falsely blamed "stepped up [] marketing efforts" on the need "to capture the resurgence in consumer" demand "as the impact of COVID-19 in China gradually declined in the third quarter of 2020."  Ex. B at 36; *see also* Ex. P at 17.  This statement was materially false and misleading because a reasonable investor would infer from it that the abrupt rise in Selling Expenses was an isolated occurrence tied to the pandemic when it was not.  Indeed, Selling Expenses ballooned to 70% of total net revenues in 4Q2020 before climbing to an astounding 72% in 1Q2021 and ultimately forcing Defendants to cut them back, a course of action that contributed to lower growth rates going forward.  ¶¶56, 132.  *See, e.g.*, *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *9 (S.D.N.Y. Apr. 14, 2020) ("statements regarding the sources of [a company's] sales growth . . . . such as 'strong demand,' [and] 'a well-defined strategy'" triggered duty to "tell the whole truth" about both topics).

16

In addition, disclosure was required by Item 303 of Regulation S-K because of the staggering rise in Selling Expenses and the undisclosed truth that reductions in such expenses were inevitable, which was reasonably expected to (and did) have a materially adverse impact on Yatsen's business. ¶¶69-72; *see Cloopen*, 661 F. Supp. 3d at 232 (General disclosure that net losses had increased which left investors without important insights as to likely future impacts insufficient to satisfy Item 303.). Contrary to Defendants' contention (MTD at 19-20 (citing Ex. B at 31)), Defendants' risk warnings and disclosure of the precise amounts of Selling Expenses in 2018, 2019 and 3Q2020 did not dispel the misleading nature of their misstatements. By the time of the IPO, Yatsen already was "unable to conduct [its] sales and marketing efforts in a cost-effective and efficient manner" and its "results of operations and financial conditions [were already] being adversely affected." *Cloopen*, 661 F. Supp. 3d at 232.[8]

**D.     Defendants Had a Duty to Disclose the Omitted Facts Concerning Yatsen's New Product Launches**

The AC also pleads facts supporting the allegation that Yatsen's lack of investment in R&D before the IPO resulted in fewer new product launches post-IPO and lower growth. Defendants' argument that these allegations are conclusory, speculative and not well pled are unpersuasive.

*First*, the criticism of the AC's reliance on data from China's National Medical Products Administration showing a decline in the number of SKUs registered by Yatsen before the IPO (MTD at 21) is unsupported by Defendants' cited authority.[9]

---

[8]     Further, for these reasons, the risk warning itself also violated Item 105 of Regulation S-K, which requires Offering Documents to discuss the most significant factors that make an Offering risky. ¶¶70-72; *Cloopen*, 661 F. Supp. 3d at 232. Because Defendants declined to address Item 105, they are unable to do so in their reply papers. *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief.").

[9]     The allegations here bear no resemblance to those in *San Landro Emergency Med. Grp. Profit Sharing Plan v. Phillip Morris Cos.*, 75 F.3d 801 (2d Cir. 1996), where plaintiffs made an "unsupported general claim of the existence of confidential company sales reports." *Id*. at 813.

*Second*, Defendants' contention that there is no connection between this data and the number of products launched after the IPO makes no sense. The data shows a decline in SKU registration before the IPO and then CEO Huang told investors in March 2021 (after the IPO) that sales from *Perfect Diary* would be disappointing in 1Q2021 because "new products" would "***not be launched until Q2*.*"  ¶109. From this it can be plausibly inferred that the decline in registered SKUs before the IPO and the launch of new products in 2Q rather than 1Q2021 were connected.

*Third*, the fact that Yatsen launched new products at various times does not undermine Plaintiffs' allegation that the low level of R&D investment resulted in fewer and less rapid product launches, which undermined growth. As alleged in the AC, the success of Yatsen's DTC model depended on developing new and popular products faster than its competitors. ¶47.

*Finally*, Defendants' characterization of the comparison between Yatsen's R&D expenditures as a percentage of revenue (0.4% in 2018, 0.8% in 2019, and 1.3% for the nine months ended September 30, 2020) and L'Oreal's 7.1% year-over-year increase in R&D expense in the first half of 2020 as "an apples-to-oranges comparison" ignores that L'Oreal's R&D expense represented 3.5% of its sales. ¶57 n.20.

## III.    PLAINTIFFS' '33 ACT CLAIMS ARE NOT TIME-BARRED

Plaintiffs' '33 Act claims have a one-year statute of limitations that "commences when the plaintiff discovers (or should have discovered) the securities law violation." *FHFA v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017) (cleaned up). A claim is "discovered" (and the clock starts to run) "when the plaintiff learns sufficient information about the violation" to "plead it in a complaint with enough detail and particularity to survive" a motion to dismiss. *Id*. (cleaned up). Dismissal on statute-of-limitations grounds requires Defendants to "make a showing, from the face of the complaint and matters of which the court may take judicial notice, that would enable the court, drawing all reasonable inference in Plaintiff's favor, to identify the 'precise moment' at

18

which Plaintiff would have had 'sufficient information'" to plead the claim. *Dentsply Sirona*, 2023 WL 2682905, at *11 (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 95 (2d Cir. 2018)). Defendants have come nowhere close to meeting this standard.

Defendants' entire argument is that the first "in a series of disclosures" that partially revealed the truth of their misstatements occurred on August 26, 2021, about one year and one month before the commencement of the Action. MTD at 25. Defendants do not explain how this partial disclosure was the "precise moment" at which Plaintiffs had information to plead a successful Section 11 claim. *Id.* Nor could they because Plaintiffs squarely allege that Defendants made numerous **actionable misstatements** on August 26. ¶¶122-34. For example, Defendants represented that any projected slowdown was "mainly attributable to the unusual quarterly seasonality pattern caused by the COVID-19 pandemic," and that they were "pleased" with *Perfect Diary's* "customer growth," "steady contribution," and "customer growth trend," when in reality Tmall/Taobao sales of *Perfect Diary* and *Little Ondine* had again declined in 2Q2021. ¶¶122-23, 132-34. Consequently, Defendants have not "irrefutably demonstrate[d]" any claims are time barred at this stage. *Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 641 (S.D.N.Y. 2017).

## IV. PLAINTIFFS HAVE ADEQUATELY PLED SCIENTER

All agree that to plead Plaintiffs' '34 Act claims the AC must "state with particularity the facts giving rise to a strong inference that the defendant acted with [scienter]."[10] MTD at 22 (alteration in original) (quoting 15 U.S.C. §78u-4(b)(2)(A)). Meeting this standard requires pleading only "an inference of scienter **at least as likely as** any plausible opposing inference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 328 (2007). This inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"

---

[10]     Scienter is not an element of Plaintiffs' strict liability '33 Act claims. *See, e.g.*, *Pareteum*, 2021 WL 3540779, at *18 (pleading scienter "is not applicable to a claim under" the '33 Act).

19

*Id*. at 324.  Instead, "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id*. at 322-23.  And "a tie on scienter goes to the plaintiff."  *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

Defendants' scienter argument fails right out of the gate because they have not offered any competing, non-culpable inferences or explanations for the alleged misstatements.  *See* MTD at 22-23.  Nor could they.  Defendants repeatedly touted the "strong" and "fast growing" sales and revenues of *Perfect Diary* and *Little Ondine* in the Offering Documents and in post-IPO statements when Defendants knew or recklessly disregarded that starting prior to the IPO and continuing until at least December 2021, those sales and revenues were either flat or declining on the crucial Tmall sales channel.  *See supra* pp. 5-10.  Likewise, the AC alleges that the '34 Act Defendants knew or recklessly disregarded that to maintain sales prior to the IPO, and for months after, Yatsen was pouring money into Selling Expenses to prop up *Perfect Diary* and *Little Ondine* in the face of stiff competition.  ¶102.  This was entirely unsustainable and came at the expense of investing in R&D, which inhibited Yatsen's ability to timely launch new products which slowed growth going forward.  *Id*.  That the '34 Act Defendants knew or recklessly disregarded these materially adverse facts is enough to plead scienter.  *See, e.g.*, *Cloopen*, 661 F. Supp. 3d at 233-37 (scienter well pled where "it is plausible to infer that . . . the officer responsible for managing [company's] finances, knew the basic facts" related to finances and company "constantly monitor[ed]" sales).

This inference of scienter is further buttressed by the core operations doctrine, which "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business."[11]  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F.

---

[11]     Defendants concede that the core operations doctrine can be supportive of scienter, even if it is not dispositive of the issue.  MTD at 23 n.9.

20

Supp. 3d 596, 623-24 (S.D.N.Y. 2017); *Cloopen*, 661 F. Supp. 3d at 237.  Here, *Perfect Diary* and *Little Ondine* were indisputably Yatsen's most important brands during the Class Period.  Indeed, over 95% of the Company's revenues in 2020 came from just sales of these brands.  ¶3.  Likewise, Tmall was the Company's most important DTC sales platform and the largest such sales channel in China.  ¶4.  Thus, the performance of *Perfect Diary* and *Little Ondine* on Tmall was part of Yatsen's core operations and it can be inferred that the '34 Act Defendants had knowledge of the brands' stalling sales and revenues.

In response, Defendants wrongly argue that the AC lacks "facts showing Yatsen's executives knew or had access to information contradicting its disclosures or violated a duty to monitor."  MTD at 23.  The AC contains detailed data from Tmall/Taobao and other sources refuting Defendants' many positive statements, including in the Offering Documents, regarding the growth and popularity of Yatsen's flagship brands and the success of its DTC model during the Class Period.  Defendants' repeated citation to Tmall data throughout the Class Period, including with respect to the Singles' Day holiday a few days before the IPO, evidences that such data were readily available to Defendants and considered an important indicator of Yatsen's financial condition and prospects.  *E.g.*, ¶¶62, 64, 137-38.  Moreover, Yatsen's DTC model turned on actively monitoring customer purchases and trends on Tmall and elsewhere.  ¶47.  The only reasonable inference to draw from these allegations is that Defendants (i) knew about the declining performance of *Perfect Diary* and *Little Ondine* on Tmall from the data available to them, or (ii) had the data and chose to ignore it, which is the epitome of recklessness.  In either case, the AC's allegations are more than sufficient to plead scienter.[12]

---

[12]     *Bd. of Trs. of Ft. Lauderdale v. Mechel OAO*, 811 F. Supp. 2d 853 (S.D.N.Y. 2011) is inapposite.  In *Mechel*, the plaintiffs did not allege executives of a coalmining conglomerate knew of certain subsidiaries' violations of Russia's anti-monopoly and tax laws.  *Id.* at 859-60, 870-71. The omissions here concern performance of Yatsen's most important brands.

21

**V.     PLAINTIFFS HAVE ADEQUATELY PLED LOSS CAUSATION AND DEFENDANTS HAVE NOT PROVEN NEGATIVE CAUSATION**

Loss causation is not an element of Plaintiffs' '33 Act claims.  *Pareteum*, 2021 WL 3540779, at \*19 ("plaintiffs bringing claims under section[] 11. . . need not allege[] . . . loss causation").   Instead, the '33 Act provides Defendants an ***affirmative defense*** of negative causation, *i.e.*, proving any "losses [are] not attributable to the alleged misrepresentation."  MTD at 24.  This "burden is a heavy one, and is generally established by a defendant on a motion for summary judgment or at trial," unless "negative causation is apparent on the face of the Complaint."  *Winter v. Stronghold Digital Mining, Inc.*, 2023 WL 5152177, at \*10 (S.D.N.Y. Aug. 10, 2023); *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272-73 (S.D.N.Y. 2007) (similar).

In contrast, loss causation is an element of Plaintiffs' '34 Act claims.  "To plead loss causation, plaintiffs must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014).  This is accomplished "either by alleging (a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'"  *Id*. at 232-33.  But, pleading "loss causation [is] 'not meant to impose a great burden upon a plaintiff,'" and so "plaintiffs need only plead 'a short and plain statement,' pursuant to Fed. R. Civ. P. 8(a)(2), that provides defendants with 'some indication of the loss and the causal connection that the plaintiff has in mind.'"  *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005)).  Where, as here, "the complaint plausibly alleges that the alleged misrepresentations caused the plaintiffs' losses, the issue of whether the loss was caused by an intervening event . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."  *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at \*26 (S.D.N.Y. Mar. 23, 2017).

Defendants first argue the AC "does not plead that the subject of the alleged omissions caused Plaintiffs' loss." MTD at 24. This is irrelevant for Plaintiffs' '33 Act claims because the statute "create[s] a factual presumption that any decline in value is . . . caused by the misrepresentation." *Levin*, 508 F. Supp. 2d at 272. And, as for the '34 Act claims, this argument elides multiple paragraphs detailing how the misstatements caused Plaintiffs' losses. *See* ¶¶141-51.

*First*, on August 26, 2021, Yatsen issued guidance for 3Q2021 projecting a slowdown in revenue growth due in part to "intensifying competition," "rising customer acquisition costs," and the need to "devote more resources to continue the growth trend of [its] main brands." ¶145. Plaintiffs allege that the 17.64% decline in Yatsen ADS on August 26 was due to this news, which partially revealed (but did not fully disclose) that sales of *Perfect Diary* and *Little Ondine* were declining and Selling Expenses were unsustainably high. ¶142.

*Second*, on November 17, 2021, Defendants revealed, *inter alia*, that sales of color cosmetics had decreased by mid-single digits. ¶146. At the same time, the Company issued guidance for 4Q2021 net revenues, predicting a decline of 15% to 20%. Plaintiffs allege these results constituted the materialization of the risks of the stalling sales of *Perfect Diary* and *Little Ondine*. *Id*. As a result of these revelations, Yatsen ADS declined 17.93% and Plaintiffs suffered more losses. As with the August 26, 2021, disclosures, the partial truth revealed on November 17 was accompanied by many misleading positive statements, like the "steady performance of *Perfect Diary*," which kept investors from fully grasping the Company's problems.

*Finally*, the full truth was revealed on March 10, 2022, when Yatsen announced a 22.1% decline in total net revenues and 17.2% drop in gross sales for 4Q2021. ¶147. CEO Haung admitted that these disappointing results were due to a "color cosmetics market [that] started to decelerate in 2020," including *Perfect Diary* and *Little Ondine*. ¶148. He also admitted that

23

Yatsen "experienced a significant deceleration in the second half of [2021]" and that beginning "last year" (*i.e.*, in 2020) Yatsen had started to realign its business to try and mitigate the collapse of color cosmetics sales.[13] ¶148. The details of these trends are exactly what Plaintiffs allege were omitted from Defendants' misstatements. Similarly, CFO Yang also admitted that the Company was having to "dramatically cut" Selling Expenses which would affect short-term sales "significantly." ¶149. The fact that Yatsen "dramatically cut" its Selling Expenses demonstrates that those expenses were at unsustainable levels, just as Plaintiffs allege. In response to this new news, Yatsen's ADS dropped 39.5% and Plaintiffs suffered more losses. ¶150.

Nothing more is required to plead loss causation. *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) ("Generally, plaintiffs sufficiently plead loss causation when they allege that their share's 'price fell significantly after the truth became known' through an express, corrective disclosure or 'through events constructively disclosing the fraud' like the 'materialization of [the] risk' concealed.").

Defendants next argue that any declines in Yatsen's share price (and damages resulting therefrom) were the "result of an industry-wide decline impacting all U.S.-listed Chinese companies." MTD at 25. This factual argument cannot be decided on this motion to dismiss. In any event, the argument relies on cherry-picked stock charts for eight "Chinese Companies" (Ex. C) that Defendants improperly attached to the MTD. *See, e.g.*, *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 287-88 (S.D.N.Y. 2013) (refusing to take judicial notice of "rising goldmining costs during 2011" and concluding that even if those costs were judicially noticeable "the Court cannot use that fact to infer anything in particular about [the] business[es] operating at the time"). Moreover, at least one of Defendants' examples, JD.Com

---

[13]    That Defendants have an alternative reading of CEO Huang's statements (MTD at 24) is a factual dispute that cannot be resolved at this stage of the proceedings.

(Ex. C at 8), actually contradicts their theory as the stock chart apparently shows a rising share price throughout 2020 and then some volatility in 2021, with both price declines and increases throughout the year.[14]

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss must be denied in its entirety. Should the Court grant Defendants' motion, Plaintiffs respectfully request leave to amend pursuant to Rule 15(a). *See, e.g.*, *Luce v. Edlstein*, 802 F.2d 49, 56 (2d Cir. 1986).

DATED:  February 2, 2024                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**


 *s/ Deborah Clark-Weintraub*
Deborah Clark-Weintraub
Thomas L. Laughlin, IV
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY  10169
Telephone: 212-223-6444
Facsimile:  212-223-6334

Jacob B. Lieberman
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Telephone: 860-537-5537
Facsimile:  860-537-4432

*Attorneys for Lead Plaintiffs and Lead Counsel for the Class*

---

[14]     Defendants only argument against Plaintiffs' §§15 and 20(a) claims is the purported failure to "state a primary violation under Section 11 or Section 10(b)."  MTD at 25 n.10.  As shown above, Plaintiffs have pled a "primary violation" so the §§15 and 20(a) claims are well pled.

**THE SHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile:  310-388-9182
brian@schallfirm.com

*Additional Counsel for Lead Plaintiffs*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

_s/ Deborah Clark-Weintraub_
Deborah Clark-Weintraub

27